**Charles RUSSOLI and Marguerite Russoli, Plaintiffs,**

v.

**SALISBURY TOWNSHIP, Salisbury Township Police Department, Thomas E. Anderson, and Kevin J. Soberick, Defendants.**

Civil Action No. 98–2688.

United States District Court, E.D. Pennsylvania.

Oct. 20, 2000.

822

828

Richard F. Stevens, Paul F. Laughlin, Stevens and Johnson, Allentown, PA, for plaintiffs.

Thomas C. Gallagher, Matthew J. Connell, Holsten and Associates, Media, PA, for defendants.

## *OPINION AND ORDER*

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

Plaintiffs Charles Russoli and Marguerite Russoli have brought the instant action pursuant to 42 U.S.C. § 1983, alleging that the Defendants, Thomas E. Anderson, Kevin J. Soberick, Salisbury Township, and Salisbury Township Police Department, violated their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.[1] They have also brought a number of state law claims. Before the Court for disposition is Defendants' Motion for Summary Judgment on all claims, filed by the Defendants on June 26, 2000. We have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

We note at the outset that the Plaintiffs failed to assert in their Complaint that this Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Further, while the Plaintiffs did allege that certain of their constitutional rights had been violated, they were not as specific as we would prefer in asserting either their federal or state claims. The Defendants have argued against our exercise of supplemental jurisdiction because of these alleged defects in the Complaint. Even if the Defendants had not objected to our exercise of supplemental jurisdiction, however, we are still "bound to consider [our] own jurisdiction preliminary to consideration of the merits" because federal courts are courts of limited jurisdiction, *Trent Realty Assocs. v. First Federal Savings & Loan Ass'n of Philadelphia,* 657 F.2d 29, 36 (3d Cir.1981); *see also Employers Ins. of Wausau v. Crown Cork & Seal Co.,* 905 F.2d 42, 45 (3d Cir.1990), and we are required to undertake such an examination sua sponte, *see id.*

■ Defendants argue in their Reply Memorandum to Plaintiffs' Response against our exercise of supplemental jurisdiction, stating that the Plaintiffs have the burden of establishing jurisdiction and failed to do so in their Complaint. Defendants also argue that it is irrelevant that they failed to object earlier to our exercise of supplemental jurisdiction. We do not agree with Defendants' arguments.

We can infer from the Complaint that Plaintiffs intended to assert both § 1983 and state law claims arising from the same alleged actions of the Defendants. Plaintiffs captioned Counts I and IX of their First Amended Complaint as § 1983 claims. Plaintiffs captioned Counts II–VIII, however, not by the law under which they are making the claim, but by the

---

1. Plaintiffs did not specify whether they were suing Anderson and Soberick, who are police officers employed by Salisbury Township, in their official or personal capacities. We assume that Plaintiffs are suing the Officers in their personal capacities, because their employer is also a named defendant, and suits brought against officers in their official capacities are treated as suits "against an entity of which an officer is an agent." *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (quoting *Monell v. Dept. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

nature of the underlying conduct giving rise to the claim, for example unlawful arrest, malicious prosecution, excessive force. In Counts II–VIII, the Plaintiffs alleged that they suffered damages including "physical and mental suffering, loss of reputation, and deprivation of Constitutional rights." Plaintiffs then sought punitive damages and "also [sought] all the statutory remedies available under Section 1983" before they made their general demand for judgment and damages. This Court infers from Plaintiffs' captioning of the counts and their method of demanding relief that Plaintiffs intended to make claims under both § 1983 and state law for Counts II–VIII, and Defendants should have been on notice that there were claims under both state law and § 1983 when they read the Complaint.[2]

Even if the Plaintiffs' method of pleading did not clearly put Defendants on notice that state law claims were made by Plaintiffs, the Third Circuit has rejected the argument that a basis for jurisdiction is waived if not alleged at the inception of the suit. *See Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874 (3d Cir. 1992). The Third Circuit stated: "We know of no absolute prohibition against asserting another basis for jurisdiction in an amendment to a pleading, provided that such jurisdiction would have existed at the time the complaint was originally filed. Many circuits have held that no such prohibition exists." *See id.* at 887 (citing *Miller v. Stanmore*, 636 F.2d 986 (5th Cir. 1981); *John M. Peters Constr. Co. v. Marmar Corp.*, 329 F.2d 421 (6th Cir.1964); *United Steelworkers of America, AFL–CIO v. Mesker Bros. Industries, Inc.*, 457 F.2d 91 (8th Cir.1972); *Local 179, United Textile Workers of America, AFL–CIO v. Federal Paper Stock Co.*, 461 F.2d 849 (8th Cir.1972); *May Department Store v. Graphic Process Co.*, 637 F.2d 1211 (9th Cir.1980)). The Federal Rules of Civil Procedure allow complaints to be amended upon motion, and direct that "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). 28 U.S.C. § 1653 specifies that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." Although the Plaintiffs have not made a motion to amend the Complaint to include § 1367(a) as a basis for this Court's jurisdiction, the fact that the courts have been instructed to liberally allow motions to amend complaints colors our decision in this case. *See Berkshire Fashions Inc.*, 954 F.2d at 886 (directing that "the discretion [to allow amendments] should be exercised within the context of liberal pleading rules").

The Third Circuit has noted that "the district court may deny a leave to amend only where in its discretion the district court finds that the plaintiff's delay in seeking the amendment is undue, made in bad faith, prejudicial to the opposing party, or fails to cure the jurisdictional defect." *Berkshire Fashions Inc.*, 954 F.2d at 886. *See also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir.1993) ("In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment."); *Tarkett Inc. v. Congoleum Corp.*, 144 F.R.D. 289, 290 (E.D.Pa.1992) ("The Third Circuit has interpreted these factors to emphasize that prejudice to the non-moving party is the touchstone for the denial of a request for leave to amend."). Defendants argue that it would be prejudicial to them to add the

---

2. It is helpful to both the Court and to the Defendants for the Plaintiffs to state both the basis for this Court's jurisdiction and the legal theories under which they are proceeding in their Complaint. Nevertheless, the Federal Rules require only notice pleading, i.e. a short plain statement of the facts giving rise to

claims for relief. The Rules do not require Plaintiffs to lay out various counts, or specify whether they arise under federal or state law. Here, the Plaintiffs have accepted the invitation of the Federal Rules of Civil Procedure to rely on notice pleading, and we will not hold their manner of pleading against Plaintiffs.

state law claims at this point in the litigation because they have already prepared a defense to Plaintiffs' allegations and prepared a motion for summary judgment based on the federal law claims only.[3] This Court disagrees that the Defendants would be so prejudiced. Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment assumed that each of the counts, except those captioned as § 1983 counts, included both state and federal claims. Instead of addressing the claims on the merits and attempting to show that they were entitled to summary judgment, however, the Defendants merely asserted that because the Plaintiffs failed to allege that this Court has supplemental jurisdiction under 28 U.S.C. § 1367, we cannot hear the state claims. Rule 8(a) requires that the complaint contain "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a). The Rule requires only a showing of jurisdictional facts, not a list of the statutory bases of the Court's jurisdiction.

Under Congress's codification of supplemental jurisdiction, "The district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). In its seminal decision on supplemental jurisdiction, the Supreme Court held that "in order for the district court to exercise 'pendent' jurisdiction over Gibbs' state law claim, the state and federal claims must derive from a common nucleus of operative fact ... such that [the plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *United ed Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). As we explained previously, Counts II through VIII allege both federal and state law claims, and each count is based upon the arrests of Mr. and Mrs. Russoli, the events surrounding the arrests, and the aftermath of the arrests. Because each state law claim arises from the same or related facts as a federal law claim, the complaint sufficiently alleges the necessary jurisdictional facts. Therefore Defendants will not be prejudiced by our exercise of supplemental jurisdiction, and we will exercise it.

## II. STANDARD OF REVIEW

The court shall render summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("*Anderson I* "). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *See id.* at 248, 106 S.Ct. 2505. All inferences must be drawn and all doubts resolved in favor of the non-moving party.

---

**3.** Plaintiffs argue that they would be prejudiced if we decline to exercise supplemental jurisdiction over their state law claims because the Defendants were on full notice that Plaintiffs were raising state law claims, such claims were covered in discovery, and Defendants waited until the statute of limitations ran on the state law claims before raising their objection to the Court's exercise of supplemental jurisdiction. (Pls.' Mem. at 23–24.) We agree that Defendants were on notice that state claims were made, but we base that conclusion only on the face of the Complaint. The Plaintiffs have not pointed to any record facts showing that the Defendants were otherwise on notice, nor have they made any reference to the record to show that state law claims were specifically included in discovery.

*See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrates the absence of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials.[4] *See id.* at 321 n. 3, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson I,* 477 U.S. at 249, 106 S.Ct. 2505.

## III. FACTUAL BACKGROUND

We will review the facts with the foregoing rules in mind. There are a number of areas of conflict in the factual background.

On Tuesday, May 19, 1998, Scarlet Brenfleck, a neighbor of Plaintiffs, told Mr. Russoli that she had heard popping noises coming from her mailbox, and she asked him to look at it. (C. Russoli Dep. at 10; *see also* S. Brenfleck Dep. at 8.) He did so, found an empty plastic tube approximately ten inches long and two inches wide that appeared to be an expended firecracker, removed it, and placed it in the street. (C. Russoli Dep. at 10, 12–13.) There was no damage to or marks inside the mailbox from the device. (*Id.* at 13.) He then checked neighboring mailboxes and found no other explosive devices. (*Id.;* S. Brenfleck Dep. at 8–9.) Another neighbor, Dale Smith, came outside and said that he had heard a pop, checked the mailboxes, and called the police. (*Id.* at 11.) Mr. Smith also stated that he had seen a young person dressed in a black costume with a skull mask fleeing the scene. (*Id.*) Mr. Russoli then returned to his residence and went inside. (*Id.* at 14.)

Salisbury Township Police Officer, Defendant Thomas E. Anderson, was called to the scene (T. Anderson Test., *Commonwealth v. Russoli,* 6/30/98, at 24–26), and he was later joined by Defendant Officer Kevin Soberick (K. Soberick Test., *Commonwealth v. Russoli,* 7/2/98, at 331). Officer Anderson stated that as he drove to the scene, he received a description of the suspect, the young person in black seen fleeing the area. (T. Anderson Test. at 10.) When he arrived at the scene, two people later identified as Mrs. Brenfleck and Mr. Smith were near the mailbox in which the device had been located and near where the device now lay on the ground. (*Id.* at 11.) Mr. Smith explained that Mr. Russoli had taken the device out of the mailbox after they had hear a fizz and a pop from it. (*Id.*) Officer Anderson ordered them to get away from the device and told them that they needed to leave the area. (*Id.*) Officer Anderson then contacted Officer Soberick, who was Salisbury

---

4. Plaintiffs' Memorandum of Law in Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment includes the report of their expert, Walter P. Connery. (*See* Pls.' Mem.App. 2.) Plaintiffs' Memorandum states that the report "clearly creates factual questions in and of itself." (*Id.* at 6.) It appears that the Plaintiffs are attempting to incorporate the report into the Memorandum or otherwise use it to oppose the Defendants' Motion for Summary Judgment, because it is mainly this report, not the Memorandum, that points to record facts to support Plaintiffs' version of the events, and to show that there are sufficient record facts to preclude our granting Defendants' Motion for Summary Judgment. Plaintiffs have submitted to the Court most of the record referred to by Mr. Connery or otherwise relied on, but not cited, by the Plaintiffs in their Memorandum.

The Court expressly disapproves of this practice and in the future we will expect that all attorneys will discuss all relevant issues in their briefs rather than incorporating them from other evidentiary sources. It is the function of counsel to raise legal issues, not expert witnesses.

Township's bomb officer, and advised him of the situation. (*Id.* at 12.) Officer Anderson said that the device looked like an incendiary explosive device, which could potentially be set off by cell phone or radio communications, so he used Mr. Smith's telephone to relay the information to the police communication center. (*Id.* at 13.) He then told Mrs. Smith to stay in her house, and she did so. (Doris Smith Dep. at 8.) Officer Anderson had had some training in dealing with a suspected explosive device, and even though Mr. Smith had already heard a fizz and a pop, Officer Anderson felt he could not be certain that the device was now safe. (T. Anderson Test. at 14.) Officer Anderson was also concerned about the possibility of a second device. (*Id.* at 15.) Because of concerns about the safety to the public and the need to secure the crime scene, Officer Anderson requested that fire police block off vehicular and pedestrian access to the area. (*Id.* at 15–16.) Officer Anderson stated that the Wescosville Fire Police blocked off the area "[e]xcept for an occasional person that adamantly wanted to get to their residence and they refused to listen to the fire police request to stay out of the area." (*Id.* at 16.) Officer Anderson went to several houses in the area and asked the residents to leave, and they complied. (*Id.* at 17.) Officer Anderson then approached Mr. Russoli, who was outside near his garage, and told him that he needed to leave the area. (*Id.* at 18.) Mr. Russoli responded, saying that Officer Anderson was overreacting, that the bomb had already gone off, and stated that he had taken the device out of the mailbox. (*Id.*) Officer Anderson again told Mr. Russoli that he needed to leave the area because the police were evacuating the houses in the neighborhood near where the device was located. (*Id.*) Mr. Russoli said that he couldn't leave because his wife was ill, and Officer Anderson repeated that Mr. Russoli should get his wife and they needed to leave the area immediately. (*Id.* at 18–19.) Officer Anderson asserts that Mr. Russoli said that he needed a few minutes to get his wife, and that they would then leave.[5] (*Id.* at 19.)

Mr. Russoli claims that Officer Anderson came to the Russoli residence, screaming that Mr. Russoli had to evacuate the area because of pipe bombs, and said that everybody is evacuating. (C. Russoli Dep. at 15.) Mr. Russoli says he attempted to inquire whether Officer Anderson was referring to the firecracker that he had already looked at, but Officer Anderson repeated his command to evacuate the area. (*Id.*) Mr. Russoli told Officer Anderson that it would be difficult to leave because his wife was ill and asked Officer Anderson how long he would have to remain away. (*Id.*) Officer Anderson stated that he should stay away for half to three-quarters of an hour, and then Mr. Russoli returned to his house. (*Id.*)

Officer Anderson asserts that he next went back to Mr. Smith's house and told him that he needed to leave. (T. Anderson Test. at 20.) Mr. Smith requested to remain in his backyard, and Officer Anderson told him that would be acceptable until the bomb squad arrived, at which time he would have to leave the area. (*Id.* at 20–21.) Mr. Smith agreed that he would leave later as requested. (*Id.* at 21.)

After Mr. Russoli returned to his house, he told Mrs. Russoli about the order to evacuate, and she told him that she had been on the telephone with the Smiths, who lived across the street and were in the home closest to the mailbox with the exploded firecracker. (C. Russoli Dep. at

15–16.) The Smiths told Mrs. Russoli that the police had told them that they may remain in their house or in the backyard.[6] (*Id.* at 16.) The Russolis deduced that if it were acceptable for the Smiths to remain, it would also be acceptable for the Russolis to remain, too. (*Id.*)

Officer Soberick arrived at the scene and took command, and Officer Anderson briefed him on the situation. (T. Anderson Test. at 21; K. Soberick Test. at 332.) Then Officer Anderson checked the houses at which he had not received a response, in case there were others who still needed to evacuate. (T. Anderson Test. at 21.) Officers Anderson and Soberick set up a command post to deal with the various emergency personnel. (*Id.* at 23.) Officer Soberick communicated with Captain Grim of the Allentown Bomb Squad and briefed him on the situation. (K. Soberick Test. at 334.) Captain Grim requested that the house that had the device in front of it, as well as the houses next to it and across the street from it be evacuated, and both fire department personnel and paramedics be on the scene. (*Id.* at 335.)

Officers Anderson and Soberick were looking at the device through binoculars from approximately 100 feet away when Officer Anderson noticed that Mr. Russoli was outside his garage, near his car. (T. Anderson Test. at 23.) This was about forty-five minutes after Officer Anderson and Mr. Russoli first spoke. (C. Russoli Dep. at 16–17.) Officer Soberick asked Officer Anderson to talk to Mr. Russoli and "see why he was outside, or why he hasn't evacuated the area." (K. Soberick Test. at 338.)

Mr. Russoli, clad only in shorts and sandals and carrying a glass containing an alcoholic beverage, proceeded to retrieve an item from his car, which was parked in the driveway approximately fifteen feet from the garage. (*Id.* at 15–17; T.

Anderson Test. at 23.) Officer Anderson approached Mr. Russoli and insisted that he leave the area, and then Mr. Russoli became loud, verbally abusive, and belligerent:

> I approached Mr. Russoli who was standing in his driveway and asked him why he hasn't left. At that point Mr. Russoli stated to me, "I'll fucking leave when I want to leave." And I stated to him he either leave now or he was going to be placed under arrest, and there was no debate, and there was no argument about it, this was an official order for him to leave. At that point Mr. Russoli stated, just a couple of fucking minutes, and then he turned his back on me and refused to answer any more questions on me, and told me I was overreacting.

(T. Anderson Test. at 24–25.) Officer Anderson also stated that Mr. Russoli had an on-the-rocks glass that he had taken a drink out of, that he could smell the odor of an alcoholic beverage on Mr. Russoli's breath, and Mr. Russoli's eyes were red and watery. (*Id.*) Officer Anderson testified as to his reasons for then arresting Mr. Russoli:

> Based on him refusing to comply with my orders I felt that Mr. Russoli wasn't—wasn't fully aware of the magnitude of the circumstances, that he was blowing it off that the bomb had already went off and there was no big deal. I felt that he had to be removed from the area because he was putting himself and he was putting others in the area in risk of injury for having to go back and asking him to leave again.

(*Id.* at 27.) Mr. Russoli had his back to Officer Anderson and the Officer placed his left hand on Mr. Russoli's shoulder and his right hand on Mr. Russoli's wrist, and then warned Mr. Russoli that this was his last chance to leave or he would be arrested. (*Id.* at 27.) Mr. Russoli jerked his hand away, and said "Now wait a minute,"

---

6. Mrs. Smith only seemed to remember speaking to Mrs. Russoli on the phone after Mr. Russoli was arrested. Nevertheless, the Smiths' instructions at the time were still to remain in their house or their backyard. (Doris Smith Dep. at 29–30, Exh. 1.)

and then Officer Anderson arrested him. (*Id.* at 27–28.) Officer Anderson asserts that he told Mr. Russoli that "he was being arrested for disorderly conduct for refusing to leave, and creating an offensive condition that was putting ourselves in jeopardy, and the fire personnel, and the rest of the personnel at risk for having to ask him several times to leave and he refused to do so." (*Id.* at 28.)

According to Mr. Russoli, Officer Anderson saw Mr. Russoli, accosted him on his own property, screamed at him, and berated him for not evacuating the area, even though the Officer could not have known whether Mr. Russoli had evacuated and returned or had simply failed to evacuate. (C. Russoli Dep. at 19.) Officer Anderson also stated that Mr. Russoli would have been too drunk to drive to evacuate, so he must not have done so. (*Id.* at 21.) Mr. Russoli stated in his deposition:

With that I said "Look, number one, you said that I could be back in half-an-hour or three-quarters of an hour. I told you my wife was sick. Thirdly, you told the neighbors that they could stay in their house or their backyard, and last but not least if there is any danger, and I don't think there is, but if there is, it's in the front of the house removed from where I'm at in my house." And he listened to all of this, and I said to him "You know what? You're really being unreasonable." With that he said "That does it. You're under arrest."

(*Id.* at 19.) Mr. Russoli also asserts that at no time did he direct obscenities toward Officer Anderson. (*Id.* at 22.)

Officer Anderson asserts that Mr. Russoli resisted the Officer's attempts to handcuff him, and that he had to knock a glass out of Mr. Russoli's hand in order to handcuff him, because he was afraid that one of them might fall on the glass or that Mr. Russoli might use it as a weapon. (T. Anderson Test. at 28.) Mr. Russoli continued to resist Officer Anderson's attempts to take him into custody, and they ended

up next to Mr. Russoli's car with Mr. Russoli almost sitting in the trunk. (*Id.* at 28–29.) At that point Officer Anderson yanked Mr. Russoli out of the trunk and walked him alongside the car, and Mr. Russoli kept trying to swipe at Officer Anderson's hand, to prevent Officer Anderson from handcuffing him. (*Id.* at 29.) Then Officer Anderson yelled to Officer Soberick for assistance in taking Mr. Russoli into custody. (*Id.*) As Officer Soberick approached, he saw Officer Anderson struggling with Mr. Russoli and Mr. Russoli trying to kick Officer Anderson. (K. Soberick Test. at 340.) Mr. Russoli continued to resist being taken into custody and being handcuffed, so Officer Anderson

took him to the ground on his driveway, and once he was on his chest, Officer Soberick was able to grab his other hand and get it behind him, and we handcuffed the other hand. Mr. Russoli continued to kick at us. And he did not comply with orders to stop resisting. And then Officer Soberick then put a hobble on him, which is a nylon restraint system that's attached to his ankles, and then to the handcuffs, that if he were to continue to kick it tightens up and prevents him from kicking us.

(T. Anderson Test. at 29–30; *see also* K. Soberick Test. at 340–41.) The Officers then brought Mr. Russoli over to the grass on the side of his driveway and continued to tell him to stop resisting. (T. Anderson Test. at 30; K. Soberick Test. at 341.) At that point Mrs. Russoli exited the house, wearing a housecoat, walked up to the Officers, and said "What the hell are you doing, you motherfuckers." (T. Anderson Test. at 30; *see also* K. Soberick Test. at 342 (stating that Mrs. Russoli came out and said "what the fuck are you doing")). Officer Anderson told her to back off or she would be arrested, and she replied "You're a fucking asshole." (T. Anderson Test. at 31.) Mrs. Russoli "clenched her right fist and bumped chest to chest" with Officer Anderson. (*Id.; see also* K. Sober-

ick Test. ("Mrs. Russoli approached Officer Anderson, went directly just chest to chest and face to face with him and called him a motherfucker.")). Officer Anderson again asked Mrs. Russoli to step back and leave the immediate area, but instead she "bumped chest to chest" with Officer Soberick. (T. Anderson Test. at 31). Officer Soberick did not testify to having any contact with Mrs. Russoli, instead stating that "I had gotten her attention and said, you need to go back to your home. And she turned towards me and started approaching me. I took a step back, and told her numerous times, along with Officer Anderson, she needed to step back and go back into her home. At that point she eventually did." (K. Soberick Test. at 343.)

Mr. Russoli was still lying on his stomach on the grass with his head turned to one side, restrained by the Officers. (T. Anderson Test. at 31.) The Officers asked Mr. Russoli if he would be willing to walk to the car, but they received no response, so they picked him up, each holding him under an arm. (*Id.* at 30–31.) Then Mr. Russoli stated that he would walk, and when asked, he stated that he would behave; therefore the Officers removed the hobble, and the three of them walked over to the police car. (*Id.* at 31; *see also* K. Soberick Test. at 344.) Only after Mr. Russoli was in the police car did the bomb squad arrive at the scene. (*Id.* at 33; K. Soberick Test. at 346.)

The Russolis' accounts of the force used by the Officers during the arrest of Mr. Russoli differ significantly from the accounts of the Officers. After Officer Anderson told Mr. Russoli that he was under arrest, Officer Anderson grabbed the glass from Mr. Russoli's hand, threw it to the ground, and without warning grabbed Mr. Russoli, handcuffed his right wrist, spun him around, and handcuffed the left wrist. (C. Russoli Dep. at 19–20.)

Mr. Russoli asserts that he did not resist at all, including attempting to kick the Officers, and everything happened too quickly to try to resist anyway.[7] (*Id.* at 20, 23–24.) Officer Anderson pushed Mr. Russoli along the length of the car, approximately sixteen feet, kicked his feet and legs out from under him, and threw him to the ground, face first. (*Id.* at 20; M. Russoli Dep. at 19.) Mrs. Russoli, clad only in her bedclothes due to her illness, exited the house and approached the Officers to inquire about her husband. (M. Russoli Dep. at 15.) Officer Soberick then joined Officer Anderson and both Officers then applied ankle restraints to Mr. Russoli. (C. Russoli Dep. at 20; M. Russoli Dep. at 20.) The Officers started to lift Mr. Russoli, and Officer Anderson then threw Mr. Russoli. (C. Russoli Dep. at 20; M. Russoli Dep. at 15.) Then Mr. Russoli was face down, with his face away from his wife, and Officer Anderson had his knee on Mr. Russoli's back. (C. Russoli Dep. at 20; M. Russoli Dep. at 15.)

Mrs. Russoli asked the officers what they were doing, but received no response. (M. Russoli Dep. at 15.) Then she said "What the hell are you doing? My husband has had lung surgery and you have your knee right on the side where he had the lung surgery and where he has had a rib removed" but still she received no response. (*Id.*) Finally, deciding that she needed to speak the Officers' language, she said, "What the fuck are you doing," which seemed to get their attention. (*Id.*) Then Officer Anderson screamed at Mrs. Russoli that she should get back in her house. (*Id.*) Mrs. Russoli denied that she "chest-butted" the Officers at this point, stating: "When you get migraines and you have four screws in your spine and you're on a heart medication and you've had a double mastectomy, you don't go around chest butting six foot guys weighing two hundred pounds as they stated .... What

7. At the time of the arrest, Mr. Russoli was 64 years old, 5′ 5 ½″ tall, and weighed approxi-

mately 140 pounds. (Complaint at Par. 2.)

would I chest butt them with?" (M. Russoli Dep. at 20–21.)

Both Officers pulled Mr. Russoli up, shoved and dragged him, without giving him a chance to walk, for about fifteen to twenty feet before they removed the ankle restraints at Mrs. Russoli's request. (C. Russoli Dep. at 20–21.) Mrs. Russoli then went back into her house. (M. Russoli Dep. at 15.) The Officers pushed Mr. Russoli several hundred feet to a police cruiser and placed him in the back seat, where he remained, handcuffed, for approximately two hours. (C. Russoli Dep. at 21.) Mr. Russoli asserts that the car was parked in the sun with the windows rolled up, and it was a hot day. (*Id.*) The Defendants assert that the car was parked in the shade, the front windows were rolled down, and one of the officers or other emergency personnel checked on Mr. Russoli every fifteen to twenty minutes. Mr. Russoli further asserts that the police car was at about the same distance to the alleged threat of the firecracker as the arrest site on his own property, and that on his property there were shrubs and trees between him and the device, but there was nothing between him and the device when he was sitting in the police cruiser. (*Id.* at 21.) Defendants assert that Mr. Russoli was approximately twenty yards from the device, within a clear line of sight, with nothing to protect him, when he was outside his house at his car. (T. Anderson Test. at 23.)

After the Officers arrested Mr. Russoli, and after the bomb squad arrived and was briefed by the Officers, the Officers saw Mrs. Russoli exit her house. (T. Anderson Test. at 33.) Mrs. Russoli walked up to Officer Anderson with an index card and a pencil, telling him to call her attorney, whose phone number was on the card. (*Id.*) Officer Anderson refused to do so, and then Mrs. Russoli started waving the pencil within about four inches of Officer Anderson's face and eyes. (*Id.*) Then Mrs. Russoli called Officer Anderson a "motherfucker," and he yanked the pencil out of

her hand and placed it in a nearby tree. (*Id.*) Officer Soberick testified, on the other hand, that Mrs. Russoli was pointing the pencil at Officer Anderson's face and holding the card up, called Officer Anderson a son of a bitch, and asked "What the fuck have you done?" (K. Soberick Test. at 351.) Officer Anderson then told Mrs. Russoli to refrain from using profanity towards the Officers and swearing at them, but she then called Officer Anderson a "fucking son of a bitch." (T. Anderson Test. at 33–34.) Officer Soberick informed Mrs. Russoli that she was under arrest. (K. Soberick Test. at 352.) Then Officer Anderson grabbed her right arm and Officer Soberick grabbed her left arm and walked her to the back of the ambulance. (T. Anderson Test. at 34.) Mrs. Russoli told Officer Anderson that she had just had surgery and had pneumonia, therefore the Officers did not handcuff her. (*Id.* at 34.) Instead, they simply told her that she was under arrest and had her seated in the back of the ambulance so that the medical personnel could monitor her. (*Id.*)

Paramedic Eric Trubilla stated that the encounter with Mrs. Russoli "degraded into a shouting match on her end, some obscenities were said. From there they removed the pencil, which, to me, was being used in a threatening manner." (E. Trubilla Test., *Commonwealth v. Russoli,* 7/1/98, at 246.) Trubilla testified that the Officers escorted Mrs. Russoli to the back of the ambulance after they told her that they were taking her into custody, but he did not remember the exact manner in which they escorted her, nor did he see what happened at the back of the ambulance. (*Id.* at 280.) The account of firefighter Steven Schneider is similar. (S. Schneider Test., *Commonwealth v. Russoli,* 7/1/98, at 298.) He was about five feet away from the Officers and Mrs. Russoli, and no members of the public were there. (*Id.* at 323.) He also testified that Mr. Russoli's legs were restrained by a strap

until he arrived at the squad car. (*Id.* at 314.)

Mrs. Russoli's account of her arrest differs from that of the Officers. After Mrs. Russoli went back into her house after her husband's arrest, she telephoned the Smiths, who told her that they had seen the Officers place Mr. Russoli in a police car. (M. Russoli Dep. at 16.) Then Mrs. Russoli spoke to her attorney, who asked that she give the Officers his phone number and ask them to call him. (*Id.*) Mrs. Russoli then exited her house, carrying a pencil and a paper with her attorney's phone number, approached the Officers, and asked them to call her attorney. (*Id.*) Officer Anderson said that he would not call anybody, and he took Mrs. Russoli's pencil and threw it to the ground. (*Id.* at 17.) Mrs. Russoli denies ever waving her pencil in Officer Anderson's face. (*Id.* at 24–25; *see also* Doris Smith Dep. at 13–14 ("[W]e saw Margie go over to . . . where the two officers were standing . . . and she was talking to him . . . . she never put her hands up to their face.")) Mrs. Russoli told Officer Anderson that he doesn't have any regard for other people's property, asked to have her pencil back, and Officer Anderson told her that she could crawl on her knees to find it. (*Id.*) Then Officer Anderson screamed at her to go back into her house. (*Id.*) Mrs. Russoli noted that if she was in harm's way, so was Officer Anderson, because they were standing next to each other. (*Id.*) Mrs. Russoli and Officer Anderson argued about Anderson watching too many police shows on television, and Mrs. Russoli, for the second and last time during the incident, directed profanity at Officer Anderson, saying "You just proved my point you fucking asshole." (*Id.* at 18.) Mrs. Russoli has asserted that none of the neighbors near the scene could have heard her, because she cannot speak very loudly because her vocal cords were damaged at birth. (*Id.* at 25–26; *see also* Doris Smith Dep. at 13 (stating that she could see part of the arrest of Mrs. Russoli, but could not hear anything being said)). Officer Anderson again told her to get

back home, and she said that she would not leave until she made sure that her husband was okay, because she did not trust the officers. (M. Russoli Dep. at 18.) Then Officer Anderson told Mrs. Russoli that she was under arrest, and each Officer grabbed one of her arms and threw her against the side of an ambulance. (*Id.* at 18, 28–29.) Officer Soberick then let go of her arm, and Officer Anderson twisted the skin on both of her arms with a grip so hard that there were fingerprints on it for three weeks. (*Id.* at 19, 29–30.) Officer Anderson threw her against the back of the ambulance, and at no time did the Officers tell or ask Mrs. Russoli to go to the back of the ambulance; Officer Anderson merely threw her there. (*Id.* at 19, 30.) Mrs. Russoli then sat in the back of the ambulance and eventually asked for her heart medication in response to Officer Anderson's inquiry whether she needed medical attention, but Officer Anderson told her to just stay there. (*Id.* at 31.) Only after three requests and after the Officers were taking the Russolis to the police station did they grant Mrs. Russoli's request to go to her house to get her heart medication. (*Id.* at 32–33.)

At some time after Mr. Russoli was placed in the police car, an officer came to the Smith residence for the second time. (Doris Smith Dep. at 9.) The officer told her that she and her husband should stay in their backyard or in their house, but then repeated that they should stay in their backyard. (*Id.*) The officer also told them that Mr. Russoli was drunk, but Mrs. Smith didn't believe him, and also stated "can't someone have a drink in their own house?" (*Id.* at 9–10.)

Mr. Russoli asserts that he was forced to take a breathalyzer test at the police station, and Officer Anderson said that the reading was .03. (C. Russoli Dep. at 35–36; M. Russoli Dep. at 35.) Defendants, on the other hand, claim that Mr. Russoli requested that a breathalyzer test be performed on him. Then Officer Anderson

told Mr. Russoli, in general terms, that he was under arrest for disorderly conduct and failing to obey a directive of the police. (C. Russoli Dep. at 36.)

The Russolis were released without being charged after about forty-five minutes at the police station. Mr. Russoli went to the emergency room at Lehigh Valley Hospital, arriving sometime between 8:30 and 9:00. (*Id.* at 38.) Mr. Russoli's ribs had started to hurt, and he also wanted to have a blood alcohol test. (*Id.*) The test results showed that Mr. Russoli's blood alcohol level was .027. (*Id.*)

On May 21, 1998, *The Morning Call* newspaper reported on the bomb incident, stated that Plaintiffs were "cited for disorderly conduct after a dispute with police over leaving the area," and quoted Salisbury Township Police Chief Allen Stiles as saying "Everybody else in the area got out." *Police News,* The Morning Call (Allentown, Pa.), May 21, 1998, at B3. Chief Stiles has testified that he did not inform the newspaper that the Russolis were cited for disorderly conduct. (A. Stiles Dep. at 65–67.)

On May 26, 1998, Plaintiffs filed their Complaint, and Defendants were served on June 1, 1998. On June 8, 1998, Plaintiffs were charged with Disorderly Conduct, stemming from the May 19 incident.[8] From June 30, 1998 through July 3, 1998, a Summary Trial was held on the Disorderly Conduct charges, and at the close of the Commonwealth's case-in-chief, after testimony of Defendants Anderson and Soberick, and others, District Justice Crawford dismissed the charges against the Russolis. On December 9, 1998, Plaintiffs filed an Amended Complaint, adding claims for abuse of process, malicious pros-

ecution, defamation, and violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

## IV. CLAIMS UNDER 42 U.S.C. § 1983

### A. Analytical Framework

Our analysis begins with a discussion of the requirements for establishing a constitutional claim under 42 U.S.C. § 1983. Section 1983 reads, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not create substantive rights; instead "it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir.1996). A plaintiff seeking to establish a claim under Section 1983 "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." *Id.* (quoting *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir.1995)).

If the Plaintiffs have made out a prima facie case for the deprivation of a federal right under color of state law, we must then determine which of the Defendants, if

---

8. The Pennsylvania Disorderly Conduct statute provides:

A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise; (3) uses obscene language, or makes an ob-

scene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa. Cons.Stat. Ann. § 5503(a). Mr. Russoli was cited for violating § 5503(a)(4) and Mrs. Russoli was cited for violating § 5503(a)(3).

any, must proceed to trial. The individual Defendants can be held liable unless they are entitled to qualified immunity for their actions. *See* Part IV. B. 2. a., *infra.*

■ In Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, not a separate judicial entity. *See, e.g., Dean v. Barber,* 951 F.2d 1210, 1215 (11th Cir.1992); *Rhodes v. McDannel,* 945 F.2d 117, 120 (6th Cir.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992); *Open Inns, Ltd. v. Chester County Sheriff's Dept.,* 24 F.Supp.2d 410, 417 (E.D.Pa. 1998); *Irvin v. Borough of Darby,* 937 F.Supp. 446, 451 (E.D.Pa.1996); *Regalbuto v. City of Philadelphia,* 937 F.Supp. 374, 377 (E.D.Pa.1995). Because Salisbury Township Police Department is merely an arm of Salisbury Township, we will grant summary judgment to the Police Department on all § 1983 claims.

■ Salisbury Township may be liable under § 1983 only for acts implementing an official policy, practice or custom of the municipality. *Monell v. Dept. of Social Services,* 436 U.S. 658, 690–691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff must identify the challenged policy, attribute it to the municipality itself, and show that the execution of the policy caused the injury suffered by the plaintiff. *Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir.1984).

## B. Unlawful Arrest Claims

In addition to Plaintiffs' general averments in their First Amended Complaint that their Fourth and Fourteenth Amendment rights were violated and the nonspecific § 1983 claim of Count I, Plaintiffs state that Count II is a claim for "Unlawful Arrest/Imprisonment" and Count VI is a claim for the "Illegal Search and/or Seizure of the Plaintiffs' Persons and/or Property." In this section we will address the propriety of the arrests of the Russolis under federal law, thus dealing with the Unlawful Arrest portion of Count II and the Illegal Seizure of Plaintiffs' Persons portion of Count VI, which are federal claims via § 1983.[9]

### 1. Prima Facie Case

■ It is clear that the arrests of the Russolis were made under color of state law. Officers Soberick and Anderson were acting in their official capacity after being dispatched to investigate reports of a suspected explosive device. Actions by an officer in his official capacity are under color of law even if they are not in furtherance of state policy and even if they violate state law. *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

■ The next step in evaluating any § 1983 claim is to identify the specific constitutional right allegedly infringed. *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). The Fourth Amendment, which proscribes unreasonable searches and seizures, U.S. Const. amend. IV, is applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and therefore governs the constitutionality of arrests by state as well as federal officials.[10] *See*

---

9. We cannot find anything in the record indicating that the Russolis or their property were ever searched, let alone illegally. Accordingly, we will enter summary judgment for the Defendants on these claims.

10. Plaintiffs also allege that they had a constitutional right under the Fourteenth Amendment to be on their property and that Defendants improperly and without cause arrested them for exercising this right. (Pls.' Mem. at

13.) The Fourteenth Amendment protects against the deprivation by the State of a person's life, liberty, or property without due process of law. U.S. Const. Amend. XIV. We understand Plaintiffs to be alleging a deprivation of a liberty interest, not a property interest, because Plaintiffs have not alleged any interference with their interests in their real property. Liberty encompasses any form of freedom of action or choice, such as whether to remain on one's property, and most

*County of Sacramento v. Lewis*, 523 U.S. 833, 842–43, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

█ Arrests made by police officers are classic seizures within the meaning of the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). Warrantless public arrests do not violate the Fourth and Fourteenth Amendments if they are based upon probable cause that the person arrested has committed a felony, or if based upon probable cause that the person has committed a misdemeanor in the officer's presence. *See United States v. Watson*, 423 U.S. 411, 422–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *see also Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir.1978). If a person is on his property but outside the curtilage of the property, he is in an "open field" and therefore in public. *See Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924).

█ Plaintiffs were arrested without a warrant, and later charged with a summary offense,[11] for conduct outside the curtilage of their home and in the presence of one or both Defendant police officers. Mr. Russoli was arrested in his driveway. (C. Russoli Dep. at 18–19; T. Anderson

Test. at 23–28.) The parties do not dispute that Mr. Russoli was outside the curtilage of his home. Mrs. Russoli was not on her property when she was arrested. (M. Russoli Dep. at 16–18; T. Anderson Test. at 33–34.) Plaintiffs allege that the arrests were made without probable cause and therefore were unlawful. It is well established in the Third Circuit that "the existence of probable cause in a Section 1983 action is a question of fact" and therefore must be decided by the jury. *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir.1997); *see also Groman v. Township of Manalapan*, 47 F.3d 628, 635 (3d Cir.1995) (reversing summary judgment as to issue of probable cause); *Deary v. Three Un–Named Police Officers*, 746 F.2d 185 (3d Cir.1984) (same); *Patzig v. O'Neil*, 577 F.2d 841, 848 (1978) (holding that "the question of probable cause in a Section 1983 damage suit is one for the jury"). Therefore we must deny summary judgment as to the substance of the § 1983 claims against the Officers for unlawful arrest. We will now address whether the officers are nevertheless immune from suit on this claim under the doctrine of qualified immunity.

**2. Qualified Immunity of the Officers**

*a. Background*

The United States Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation because "[t]he entitlement is an immunity from suit rath-

---

fundamentally, the right to be free from physical restraint. We need not decide whether one has a fundamental right to remain in one's home or on one's real property in the face of a governmental order to evacuate, or whether one must be given procedural due process before being given such an order or forced to evacuate, because the Russolis did not in fact evacuate, nor were they dispossessed of their property. The Russolis were first deprived of their liberty when they were physically restrained, i.e. arrested by Defendants. The Fourth Amendment standards for seizures are incorporated into the meaning of "liberty" in the Fourteenth Amendment, *Mapp. v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6

L.Ed.2d 1081 (1961), therefore due process requires that arrests without prior judicial approval, such as those of the Russolis, be based on probable cause, *see United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Therefore the Russolis have not alleged anything different than their Fourth and Fourteenth Amendment right to be free from unlawful arrest.

11. Disorderly conduct may be charged as a misdemeanor if the actor "persists in disorderly conduct after reasonable warning or request to desist." 42 Pa. Cons.Stat. Ann. § 5503(b).

er than a mere defense to liability." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The Supreme Court has established that qualified immunity shields state officials performing discretionary functions from suit for damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In evaluating the Officers' claims of qualified immunity, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); *see also Wilson v. Layne,* 526 U.S. at 609, 119 S.Ct. 1692; *Wilson v. Russo,* 212 F.3d 781 (3d Cir.2000). If a clearly established right has been violated, we must determine whether a reasonable officer would have known that his conduct violated the right; if a reasonable officer would have so known, then an officer is not entitled to immunity for such actions. *See Harlow,* 457 U.S. at 813–20, 102 S.Ct. 2727; *Bartholomew v. Commonwealth of Pennsylvania,* 221 F.3d 425, 428 (3d Cir. 2000).

As discussed in Part IV. B. 1., *supra,* Plaintiffs have alleged that they were arrested without probable cause in violation of their Fourth Amendment rights. The Supreme Court has mandated that courts decide whether a right has been violated before determining whether officers have qualified immunity. *See Wilson,* 526 U.S. at 609, 119 S.Ct. 1692; *Conn,* 526 U.S. at 290, 119 S.Ct. 1292. The Third Circuit has noted that "tension exists as to the proper role of the judge and jury where qualified immunity is asserted." *Sherwood v. Mulvihill,* 113 F.3d 396, 401 (3d Cir.1997).

Such tension exists in the instant case because while "the application of qualified immunity is a question of law," *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the existence of probable cause in a § 1983 action is a question of fact, *see Sherwood,* 113 F.3d at 401; *Groman,* 47 F.3d at 635. Because Plaintiffs must show that they were arrested without probable cause, the existence of probable cause is an issue that the jury must decide. There are genuine and material factual disputes concerning the existence of probable cause, and we cannot decide at this time whether the Russolis' rights were violated when they were arrested. If the jury decides that the Officers did have probable cause, then the Officers are immune. But even if the jury decides that the Officers did not have probable cause to arrest the Russolis, and the Russolis' constitutional rights were violated, the Officers could still have qualified immunity.

Once plaintiffs have alleged the violation of an actual constitutional right, the determination of "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. at 639, 107 S.Ct. 3034 (quoting *Harlow,* 457 U.S. at 818–819, 102 S.Ct. 2727). The Supreme Court has explained that the meaning of "clearly established" depends on " 'the level of generality at which the relevant "legal rule" is to be identified.' " *Wilson,* 526 U.S. at 614, 119 S.Ct. 1692 (quoting *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034). The Court further explained that

[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very ac-

tion in question has been previously held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 614–15, 119 S.Ct. 1692 (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034). To determine whether an objectively reasonable person in the Officers' position would have known that his conduct violated clearly established rights, we must evaluate "the objective (albeit fact-specific) question whether a reasonable officer could have believed ... [the arrests] to be lawful, in light of clearly established law and the information the officer possessed." *Anderson*, at 641, 107 S.Ct. 3034. Under this standard, immunity is based on whether the officials' "actions could reasonably have been thought consistent with the rights they are alleged to have violated," not on their subjective understanding of the law. *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034; *see also Malley v. Briggs*, 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

■ Although the police may make stops and conduct searches with less than probable cause to believe a crime has been committed, *see, e.g., Vernonia School District v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (upholding the warrantless, suspicionless testing of public school athletes for drug use); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (upholding suspicionless roadblock stops of motorists for purpose of finding drunk drivers); *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (upholding the warrantless search of probationer's house by probation officer on the basis of "reasonable grounds"); *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (allowing public employer to make a work-related search of employee's workplace based on individualized suspicion); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (upholding search of public school student's purse based on reasonable suspi-

cion); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (upholding investigatory stop and frisk for weapons based on reasonable suspicion), the requirement of probable cause before the police may arrest a person is clearly established, *see, e.g., Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Dunaway v. New York*, 442 U.S. 200, 213, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *United States v. Watson*, 423 U.S. 411, 422–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) ("The requirement of probable cause has roots that are deep in our history."). The Supreme Court, however, has held that "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227, 112 S.Ct. 534 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). A court should not deprive police officers of their immunity unless the law existing at the time clearly proscribed the action they took. *See Mitchell*, 472 U.S. at 528, 105 S.Ct. 2806.

Probable cause exists when the facts and circumstances personally known by an officer and of which he had reasonably trustworthy information are sufficient to warrant the belief by a prudent person that the person to be arrested has committed or was committing an offense. *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In this case, the appropriate question is the objective inquiry of whether a reasonable officer could have believed that he had probable cause to arrest persons for disorderly conduct when they refused to evacuate from their own property or refused to stop using profanity directed against the officers, in a situation in which a suspected explosive device was present, in light of clearly

established law and the information the officers possessed.

The Pennsylvania disorderly conduct statute provides that:

A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise; (3) uses obscene language, or makes an obscene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa. Cons.Stat. Ann. § 5503(a). "Public" as used in the statute means "affecting or likely to affect persons in a place to which the public or a substantial group has access," including "any neighborhood." *Id. at* (c).

b. *Arrest of Mr. Russoli*

■ The existence of qualified immunity for the disorderly conduct arrest of Mr. Russoli turns on whether a reasonable officer, given all the facts and circumstances known to him at the time, would have believed that Mr. Russoli was recklessly creating a risk of inconvenience to the public by creating a condition that was hazardous to the public and that served no legitimate purpose by returning to his house after being ordered to evacuate, and then refusing to evacuate or return to his house immediately after he exited the house forty-five minutes after his initial encounter with Officer Anderson. Review of the relevant testimony reveals inconsistencies regarding the series of events which led up to Mr. Russoli's arrest. The parties dispute whether residents in the perimeter of a 300 foot radius from the device were told that they may remain in their homes, and if they left instead, what time they could return. Mr. Russoli alleges that Officer Anderson told him that he had to evacuate, but that he could return in forty-five minutes. He also alleges that

the Smiths were told that they may remain in their home. Even the Officers' own testimony indicated that remaining in the home was an acceptable alternative to evacuating. When Officer Soberick told Officer Anderson to talk to Mr. Russoli after he exited his house, he instructed that Officer Anderson "see why he was outside, or why he hasn't evacuated the area." (K. Soberick Test. at 338.) Further, both times that Mrs. Russoli exited her house during the incident, the Officers told her to go back inside. The facts of what Officer Anderson told Mr. Russoli and his neighbors are material to the reasonableness in the belief of probable cause, because if Mr. Russoli complied with what Officer Anderson said, then a reasonable officer could not have probable cause to arrest him for failure to evacuate.

Mr. Russoli was not in his house, however, when he was arrested. So even if remaining in the house were an acceptable alternative, he failed to do so. But whether this creates in the mind of a reasonable officer probable cause to arrest depends on a number of factors. If the order to evacuate or remain in the house expired after forty-five minutes, which is in dispute, and Mr. Russoli exited his house afterwards, then there would be no probable cause. If Officer Anderson then repeated the order to evacuate or remain in the house, or even just to evacuate, then probable cause would depend on what both Mr. Russoli and Officer Anderson knew and said to each other in that conversation, and whether Officer Anderson even gave Mr. Russoli a chance to comply.

The parties dispute whether Mr. Russoli was given another warning to evacuate or just arrested for having failed to do so. Even if, as Officer Anderson asserts, he gave Mr. Russoli more warnings to evacuate or face arrest, it is not clear whether Officer Anderson actually gave Mr. Russoli a chance to comply with the final order to leave. According to Officer Anderson, he placed his left hand on Mr. Russoli's shoulder and his right hand on Mr. Russoli's

wrist, and then warned Mr. Russoli that this was his last chance to leave or he would be arrested. Mr. Russoli jerked his hand away, and said "Now wait a minute," and then Officer Anderson immediately arrested him, apparently without giving Mr. Russoli a chance to comply with the last order to leave.

Both Officer Anderson and Mr. Russoli agree that Mr. Russoli believed that the evacuation was unwarranted because the device had already detonated. It is clear from Officer Anderson's testimony that he never told Mr. Russoli of his asserted bases for arresting him for creating a hazardous condition: the danger of a possible second device, the need for a complete evacuation before the bomb squad will inspect the original device, and the belief that he was putting others at risk by failing to evacuate. (T. Anderson Test. at 18–19, 24–28.) If the material facts discussed previously were as Mr. Russoli asserted, and the arresting officer knew that Mr. Russoli did not know of the hazard he was allegedly creating, then a reasonable officer could not believe that he had probable cause to arrest Mr. Russoli for intentionally or recklessly creating such a hazardous condition, because the officer would know that Mr. Russoli did not have the requisite intent.

Because the facts of what Officer Anderson and Mr. Russoli knew and believed about the extent of the emergency and what they said to each other are material and in dispute, we cannot decide "whether a reasonable officer could have believed ... [the arrests] to be lawful, in light of clearly established law and the information the officer possessed." *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034. Therefore at this point in time we cannot rule on whether Officers Anderson and Soberick are entitled to qualified immunity. *See Sharrar v. Felsing*, 128 F.3d 810, 828 (3d Cir.1997) (noting that even though the determination of the reasonableness of the officer's belief in the existence of probable cause is a question of law, "resort to a

jury is appropriate in deciding the qualified immunity issue" if facts material to the reasonableness of the officers' beliefs and actions are in dispute); *see also Karnes v. Skrutski*, 62 F.3d 485, 496–97 (3d Cir.1995) (noting that what officers knew was subject to dispute); *accord, Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir.1993) ("It must be recognized that even though [*Hunter v.*] *Bryant* diminished the jury's role in qualified immunity cases, it did not entirely abolish it. Rule 56 still has vitality in qualified immunity cases if [there are] underlying historical facts in dispute that are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them.") (internal citations omitted), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994). Therefore the Officers' motion for summary judgment based on an assertion of qualified immunity from the § 1983 claim arising from the arrest of Mr. Russoli will be denied at this time without prejudice. The disputed facts will have to be resolved by a jury.

### c. Arrest of Mrs. Russoli

There are no material facts in dispute that preclude us from ruling on whether the Officers are entitled to qualified immunity for the arrest of Mrs. Russoli. *See Sharrar*, 128 F.3d at 828. Both the arrest report and citation of Mrs. Russoli indicate that she was arrested for violating Pa. Cons.Stat. § 5503(a)(3), the obscenity section of the disorderly conduct statute. Mrs. Russoli admits to using some profanity directed against the Officers, but not nearly as much as they allege. Mrs. Russoli asserts that she was arrested for refusing to return to her home, and she was not warned about using profanity against the Officers. Even if the Officers arrested Mrs. Russoli directly after she refused to return to her home, and if they did not warn her to cease using profanity toward them, she does admit to

calling Officer Anderson "a fucking as-shole" shortly before she was arrested. Therefore we must determine whether a reasonable officer could have believed that he had probable cause to arrest Mrs. Russoli for making such a statement because she thereby intentionally or recklessly created a risk of "public inconvenience, annoyance or alarm" by using "obscene language." [12]

Obscene language can be the basis of a conviction for disorderly conduct if it is consistent with material not protected by the First Amendment as obscene, or if it constitutes fighting words. *See, e.g., United States v. McDermott,* 971 F.Supp. 939 (E.D.Pa.1997); *Brockway v. Shepherd,* 942 F.Supp. 1012 (M.D.Pa.1996); *Commonwealth v. Mastrangelo,* 489 Pa. 254, 414 A.2d 54, 58 (1980); *Commonwealth v. Pringle,* 304 Pa.Super. 67, 450 A.2d 103 (1983). "The cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder." *Commonwealth v. Greene,* 410 Pa. 111, 189 A.2d 141, 144 (1963). It need not be shown, however, that any specific persons of the general public were actually disturbed. *See Basista v. Weir,* 340 F.2d 74 (3d Cir.1965). The Officers and Mrs. Russoli agree that no members of the public were within earshot, because they had been evacuated. Only Mrs. Russoli, the Officers, and other emergency response personnel were present. Mrs. Russoli could see a number of neighbors from the location at which she was arrested, along a sidewalk that was undisputedly "in public." (M. Russoli Dep. at 27–28 & Exh. 1.) Mrs. Russoli asserts that she is unable to shout due to a medical condition, but she can "raise [her] voice to a point where [she] want[s] someone to notice when [she is]

annoyed," and she apparently did so when she called Officer Anderson "a fucking as-shole." (*Id.* at 25–26.) Even if the neighbors could not hear the exchange between Mrs. Russoli and the Officers, at the time of the events it was well settled under Pennsylvania law "that one may be convicted of disorderly conduct for engaging in the activity of shouting profane names and insults at police officers on a public street while the officers attempt to carry out their lawful duties." *Commonwealth v. Pringle,* 304 Pa.Super. 67, 450 A.2d 103, 106 (1982) (calling police officers "goddamn fucking pigs" in the course of their duties was proscribable under § 5503(a)(3)). At least as late as 1997 the single statement "Fuck you, asshole" directed at a police officer in a normal tone of voice constituted fighting words as required for disorderly conduct and recklessly created a risk of public inconvenience, annoyance, or alarm, even though the statement was witnessed only by the officer. *Commonwealth v. Hock,* 696 A.2d 225 (Pa.Super.Ct.1997), *rev'd* 556 Pa. 409, 728 A.2d 943 (1999). In *Hock,* any violent response from the officer incited by the statement would have occurred in public because the incident occurred in front of an apartment house, which was "clearly 'a place to which the public or a substantial group has access.'" *Id.* (quoting § 5503(c)). Even if the statement were heard only by the recipient officer, it would still be within the statute, because "one who exhibits disorderly behavior in a public place is guilty of disorderly conduct even if that behavior is directed at a single individual." *Id.* (quoting *Commonwealth v. Young,* 370 Pa.Super. 42, 535 A.2d 1141, 1143, *alloc. denied,* 518 Pa. 649, 544 A.2d 961 (1988)).

In addition to the direct effect of the profanity admittedly used by Mrs. Russoli,

---

**12.** We must apply the law of disorderly conduct in Pennsylvania as it existed on the date of the events on question, May 19, 1998. Therefore *Commonwealth v. Hock,* 556 Pa. 409, 728 A.2d 943 (1999), the latest interpretation of § 5503(a)(3) by the Pennsylvania Supreme Court, is not controlling. In *Hock,* the court emphasized that the disorderly conduct statute may not be used to protect police from all verbal indignities, especially under the theory that officers are likely to breach the peace when so addressed, because police must expect that they will be exposed to such language because they frequently deal with emotionally charged situations. *See id.* 728 A.2d at 946.

her statement may have made it more difficult and time consuming for the Officers to deal with her and thus limited their ability to deal with the emergency situation at hand. Distracting and delaying the Officers therefore indirectly could have caused public inconvenience by lengthening the time residents were required to remain away from their homes. This is an additional basis for a reasonable officer to believe he had probable cause to arrest Mrs. Russoli for disorderly conduct.

The statement Mrs. Russoli admits to having made is akin to statements previously held to be fighting words. Therefore even though the facts are in dispute as to which profanities Mrs. Russoli directed at the Officers, such dispute is not material. Whether her objectionable remarks were limited to those noted, or were more extensive and severe as alleged by the Officers, a reasonable officer could have believed that Mrs. Russoli was recklessly creating a risk of "public inconvenience, annoyance or alarm," through the language she used. Therefore the Officers' arrest of Mrs. Russoli "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)), because her statement would support a belief by a reasonable police officer that he had probable cause to arrest her. We therefore find that the Officers have qualified immunity for the arrest of Mrs. Russoli, and we will grant partial summary judgment as to the § 1983 claim under the Fourth and Fourteenth Amendments to the United States Constitution against the Officers based on the arrest of Mrs. Russoli.

*d. The Emergency Doctrine*

■ As an alternative to the probable cause analysis, it might be possible that the Officers' arrests of Mr. and Mrs. Russoli were objectively legally reasonable under the community caretaking or emergency doctrine. As the Supreme Court has stated in dicta, "[w]e do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Further, the Court has noted that the " 'need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent an exigency or emergency.' " *Mincey,* 437 U.S. at 392–93, 98 S.Ct. 2408 (quoting *Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir. 1963)). When police are acting in emergencies in their community caretaking function, i.e., performing their duty to protect community safety, rather than acting in their investigatory function, *see Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (describing community caretaking functions at those police functions, such as rendering assistance after traffic accidents, "totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute"), they may make warrantless searches and seizures in circumstances in which they reasonably believe that their action is required to deal with a life-threatening emergency. *See Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (holding that administrative inspections of private dwellings are subject to the Fourth Amendment when the inspector has the time to get a search warrant, but noting that "nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has upheld in emergency situations" such as exposure of the public to unwholesome food or disease); *United States v. Mayes,* 670 F.2d 126, 128 (9th Cir.1982) (citing *Mincey,* 437 U.S. at 393, 98 S.Ct. 2408) (holding that it

was reasonable for an official to enter an apartment without consent or warrant to retrieve the object that caused a child's life-threatening injury so that the child's attending physician could examine it and better provide treatment).

The community caretaking or emergency doctrine has been used in a number of situations by state and federal courts to find searches or seizures to be reasonable under the Fourth Amendment. *See generally* John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions*, 89 J.Crim. L. & Criminology 433, 459–507 (1999) (describing cases involving persons in need of medical treatment; missing persons; kidnapping; children in danger; reports of possible assaults, burglaries, explosions or fires in progress; reports of persons with guns, gunfire, or possible homicides; presence of explosive devices or volatile chemicals). For example, the Supreme Court has held that firefighters not only may enter buildings without a warrant to extinguish the fire, but also may remain for a reasonable time thereafter to investigate the origins of the fire and seize evidence of arson that is in plain view. *See Michigan v. Clifford*, 464 U.S. 287, 293, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (plurality) (noting that "[b]ecause determining the cause and origin of a fire serves a compelling public interest, the warrant requirement does not apply" in certain cases, such as when there is an immediate threat that the fire may rekindle); *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) ("A burning building clearly presents an exigency of sufficient proportion to render a warrantless entry 'reasonable.'... Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze.").

In *Cady*, 413 U.S. at 447–48, 93 S.Ct. 2523, the Supreme Court held that the warrantless search of a car, including the trunk, was reasonable because under the facts of the case, the search was necessary to protect the general public. Police officers had responded to a traffic accident involving an off-duty Chicago police officer. Without an intent to investigate possible crimes, the police had the car towed to a private garage and conducted a warrantless search for the officer's service revolver, which they believed the officer was required to carry at all times. Because the trunk was "vulnerable to intrusion by vandals" who could harm members of the general public if they removed the revolver, the Court held that the search was not unreasonable within the meaning of the Fourth and Fourteenth Amendments. *See id.*

Lower courts have applied the community caretaking doctrine in cases involving reports of explosions or the presence of explosives or hazardous chemicals. In *United States v. Boettger*, 71 F.3d 1410, 1412 (8th Cir.1995), the Eighth Circuit upheld multiple entries into an apartment for two days after an explosion occurred and seriously injured the defendant, the resident of the apartment.[13] Each entry by government agents was made to determine the cause of the explosion and to prevent further explosions of the chemicals and approximately twenty-five devices found, and after an agent arrived who had the expertise to neutralize the chemicals and devices, they were removed and no further entries were made. *See id.* at 1415. The Eighth Circuit relied on the premise that government officials can take reasonable measures to mitigate a continuing danger to the public, *see id.* at 1414 ("The reasonableness of a search will depend on 'the circumstances of the particular [hazard] and generally will involve more than the lapse of time or the number of entries and

---

**13.** It should be noted that within two hours of the arrival of the police, they evacuated the apartment building and the three surrounding apartment buildings, only allowing the resi-

dents to return after the threat of explosion had been defused, two days later. *See Boettger*, 71 F.3d at 1412.

re-entries.'") (quoting *Clifford*, 464 U.S. at 298 n. 9, 104 S.Ct. 641), and also noted that the defendant's expectation of privacy was diminished because of the dangers to others created by his experimenting with explosives. *See id.* The Eighth Circuit found the danger in this situation to be equivalent to the danger of a fire rekindling after it is extinguished, and held that all of the entries were justified under the emergency exception because they all occurred while the materials posed a continuing threat to the public. *See id.* at 1416.

Other courts agree that the presence of potentially explosive chemicals presents a continuing danger that justifies the warrantless search and seizure of a residence. *See United States v. Urban*, 710 F.2d 276, 278 (6th Cir.1983) ("The presence of potentially explosive chemicals in the defendant's house are exactly the kind of 'continuing dangers'" the Supreme Court contemplated when it ruled in *Tyler* that officials could remain on the scene for a reasonable time to determine the cause of the hazard); *United States v. Callabrass*, 607 F.2d 559, 564 (2nd Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980) (exigency due to need to dispose of dangerous chemicals in order to render the premises safe); and *United States v. Clark*, 617 F.Supp. 693, 697 (E.D.Pa.1985), *aff'd*, 791 F.2d 922 (3rd Cir.1986). In *Clark*, firemen and a policeman were lawfully in a residence seeking the source of smoke when they inadvertently discovered a methamphetamine lab. *See* 617 F.Supp. at 695–96. The Court likened the danger of explosion to that of a rekindling fire in *Tyler* and *Clifford* and held that the "exigency caused by the existence of large quantities of potentially explosive chemicals and a recently 'cooking' lab ... was not 'extinguished' by the fire department. The exigency required dismantling of the clandestine lab, and this justified summoning experienced narcotics agents to handle that disassembly." *Id.* at 697. These cases apply the reasoning of *Tyler* and *Clifford* that all the ex-

isting circumstances need to be examined to determine whether a warrantless search was justified and heavily weigh the danger to the public in their analysis.

Although the community caretaking or emergency doctrine has never been used to justify taking someone into custody without probable cause to believe that a crime has been committed, the application of the doctrine to other Fourth Amendment contexts might make it reasonable for an officer to believe that it applied in the context of arrests. The reasonableness of the arrests in the instant case, however, would depend on similar factual determinations as in the probable cause analysis, including whether the Officers reasonably believed that there was a life-threatening emergency that mandated their actions, i.e. whether they reasonably believed that Mr. or Mrs. Russoli was creating a condition hazardous to themselves or others, or both. We need not decide this as to Mrs. Russoli's arrest because we found that the Officers were entitled to qualified immunity. Because these facts would have to be determined by the jury, a finding of qualified immunity for the arrest of Mr. Russoli based on the community caretaking doctrine would be inappropriate at this time. Furthermore, we see no need to extend the doctrine to the facts in this case, because the Officers did not explicitly base their arrest on this doctrine, but instead they based the arrests on the violation of the disorderly conduct statute, and because the doctrine was not briefed by counsel. The doctrine does tell us that the Officers were permitted to take reasonable measures to deal with a bomb emergency.

## C. Excessive Force Claims

### 1. Prima Facie Case

As discussed in Part IV. B. 1., *supra*, Officers Soberick and Anderson were clearly acting under color of law when they arrested the Russolis.

Next we must determine whether Plaintiffs have made out a prima facie case for the deprivation of their constitutional rights arising from the alleged excessive force used by Officers Soberick and Anderson when they arrested Plaintiffs.[14] A claim for excessive force arising from an arrest "should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). The Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* The Fourth Amendment reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Third Circuit also requires that we consider "how many individuals the officers confronted and whether 'the physical force applied was of such an extent as to lead to injury.'" *Mellott v. Heemer*, 161 F.3d 117, 122 (3d Cir.1998) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir.1997)).

The Supreme Court further stated that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $20/20$ vision of hindsight," *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. 1865, and that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. In an excessive force case, just as in other Fourth Amendment contexts, the "reasonableness" inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865. The Court also noted that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* at 396, 109 S.Ct. 1865 (quoting *Johnson v. Glick*, 481 F.2d at 1033).

Even though when we examine the facts we sort them into the factors described by the Supreme Court and the Third Circuit, we do not simply count which factors favor Plaintiffs and which favor Defendants, but instead look at the totality of the circumstances in determining the reasonableness of the Officers' actions. A number of factors weigh against our finding that a reasonable officer would have believed that force was justified in this case. Disorderly conduct is not a serious crime: generally it is a summary offense, but it can be a third degree misdemeanor. *See* 18 Pa. Cons.Stat. Ann. § 5503(b). Neither Mr. nor Mrs. Russoli attempted to evade arrest by flight. At the time of each arrest, the Officers had no other individuals to confront, so there attention was not being drawn elsewhere by other persons. The Russolis have alleged that they suffered physical injuries, includ-

---

14. We note that the Defendant Officers dispute the extent of the force they are alleged to have used against Plaintiffs. The record facts will be viewed in the light most favorable to the Plaintiffs, the non-moving party, to determine whether even under the facts they allege, Defendants are entitled to summary judgment.

ing the aggravation of pre-existing conditions, from the force used by the Officers. The questions of whether the Russolis posed an immediate threat to the safety of the Officers or others and whether they actively resisted arrest overlap somewhat and require more analysis.

The reasonableness of the belief that the Russolis posed a threat to the Officers and the community depends, inter alia, on the Officers' belief in the existence of a bomb emergency and the extent of that emergency. Let us assume, arguendo, that the arrests of the Russolis were justified because the bomb squad would not defuse the device until the residents were out of the area, and the Russolis were the only residents still in the area. Theoretically, then, the Russolis were posing a threat to the Officers and community, because presumably the device in question or a possible secondary device in the area could have detonated during the delay caused by the Russolis' failure to evacuate. In determining whether a reasonable officer would have been justified in using force in this situation, however, the issue is the difference in the time needed and threat to the Officers to deal with the Russolis in the presence or absence of the excessive force alleged, looking at all the circumstances known to the Officers.

The physical condition of the Russolis that would have been apparent to the Officers is relevant in this analysis. The age and weight of the Russolis relative to the Officers would have been apparent to them at the scene. Both Russolis are significantly shorter, lighter, and older than the Officers, and therefore if they were unarmed they would pose little direct physical threat to the Officers.[15] The Russolis' medical history and health status at the time of the arrest would not have been apparent to the Officers. Mr. Russoli, however, told Officer Anderson that his wife was ill, and therefore she could not leave, and Officer Anderson admits that Mr. Russoli said this to him. Mrs. Russoli testified that during the arrest of Mr. Russoli, when Mr. Russoli was on the ground lying face down and Officer Anderson had his knee on Mr. Russoli's back, she told the Officers that Mr. Russoli had had part of a lung removed.[16]

We also have the question whether either of the Russolis actively resisted arrest, thereby extending the time required by the Officers to arrest them. Mr. Russoli denies resisting arrest in any way, though Defendants allege that he actively resisted arrest and tried to kick the Officers. It appears that both sides agree that Mrs. Russoli did not resist arrest.

Assuming that the apparent physical condition of the Russolis was as they alleged, and that the Officer[s] quickly disarmed the Russolis of their potential weapons, and that neither of the Russolis resisted arrest, then any subsequent use of

15. Both Russolis had objects at the time of their arrests that an Officer could reasonably believe could be used as a weapon. Mr. Russoli was holding a glass and Mrs. Russoli had a pencil. The facts are disputed whether either brandished such objects in a threatening manner, but in both cases Officer Anderson quickly removed the possibility of such a threat by disarming the Russolis, so any subsequent use of force by the Officers could not be justified on the basis of potential weapons the Russolis may have had.

In their Complaint, Plaintiffs alleged that their Fourth Amendment rights were violated through an unreasonable seizure of their property, but they failed to specify the property that was allegedly seized. Conceivably they could have been referring to the breaking of the glass Mr. Russoli was holding after Officer Anderson knocked it away, or even to the pencil that Mrs. Russoli was holding and allegedly waving in Officer Anderson's face. Plaintiffs' Memorandum fails to address any claim as to an unreasonable seizure of property, therefore we deem such a claim to have been waived. Even if such a claim were not waived, we would find such seizures, which were uses of force, to be reasonable under the *Graham v. Connor* standard. Accordingly, we will enter summary judgment for the Defendants as to any seizure of property claims.

16. People do not always tell officers the truth, but in this case we are viewing the facts in a light most favorable to the Plaintiffs.

force could only possibly be justified by the threat of the delay caused by the Russolis in finding or defusing the alleged bombs.

After Officer Anderson told Mr. Russoli he was under arrest, without warning he grabbed Mr. Russoli, handcuffed his right wrist, spun him around, and handcuffed his left wrist. Mr. Russoli asserts that he did not resist at all, but Officer Anderson pushed Mr. Russoli along the length of the car, approximately sixteen feet, kicked his feet and legs out from under him, and threw him to the ground, face first. Officer Soberick then joined Officer Anderson and both Officers then applied ankle restraints to Mr. Russoli. The Officers started to lift Mr. Russoli, and Officer Anderson then threw Mr. Russoli to the ground. Then Mr. Russoli was face down, with his face away from his wife, and Officer Anderson had his knee on Mr. Russoli's back. Mrs. Russoli asked the officers what they were doing, but received no response. She then said "What the hell are you doing? My husband has had lung surgery and you have your knee right on the side where he had the lung surgery and where he has had a rib removed" but still she received no response. Both Officers pulled Mr. Russoli up, shoved and dragged him, without giving him a chance to walk, for about fifteen to twenty feet before they removed the ankle restraints at Mrs. Russoli's request. The Officers pushed and dragged Mr. Russoli several hundred feet to a police cruiser and placed him in the back seat, where he remained, handcuffed, for approximately two hours. The car was parked in the sun with the windows rolled up, and it was a hot day.

After Officer Anderson told Mrs. Russoli that she was under arrest, the Officers resorted to force before even trying to peaceably take Mrs. Russoli into custody. Officer Anderson and Officer Soberick each grabbed one of her arms and threw her against the side of an ambulance. Officer Soberick then let go of her arm, and Officer Anderson twisted the skin on both of her arms with a grip so hard that there were fingerprints on it for three weeks. Officer Anderson threw her against the back of the ambulance, where she remained until she was placed in the police car with Mr. Russoli.

Although we must "keep in mind that a threat that may seem insignificant to us in the security of our chambers may appear more substantial to a reasonable officer whose own life or security is at stake," *Mellott v. Heemer*, 161 F.3d 117, 122 (3d Cir.1998), we find that the force Defendants are alleged to have used against these Plaintiffs, under circumstances viewed favorably to Plaintiffs, was unreasonable. Because of the relative size and age of the Defendants and Plaintiffs, little force should have been necessary to take the Russolis into custody. Further, the activities of the Russolis did not substantially interfere with the Officers' ability to deal with the emergency situation and thereby physically threaten the Officers or community. The bomb squad had not yet even arrived when Mr. Russoli was arrested, and the Officers were simply waiting for it and observing the device through field glasses.

The location of the arrests did not place the Officers at more risk from the device than they were in at their command post or the various locations they were at during the incident, or the locations at which the Russolis were held while in custody. Mr. Russoli was arrested approximately 112 feet from the device, but then the Officers placed him in a police car only 119 feet from the device. Mrs. Russoli was arrested at the command post, approximately 150 feet from the device. At no time were the Russolis held more than 200 feet from the device. The Officers could not reasonably have concluded that the proximity of the arrest locations to the device was dangerous, because the Officers themselves were nearly as close, and it must be noted, well within the 300 foot minimum evacuation perimeter that both the Salisbury Township and Allentown

Bomb Squad policies required. As Captain Grim of the bomb squad testified, he would not work on such a device if any non-bomb squad personnel were within this perimeter. The fact that the Officers, those in their custody, and other emergency personnel remained well within this perimeter indicates that the Officers may not have considered the device to be very dangerous. This circumstantial evidence of the Officers' opinion of the threat that the device posed precludes us from finding that the force the Officers are alleged to have used could be considered reasonable. Using force may have enabled the Officers to quickly deal with the Russolis and then return to their duty to deal with the emergency situation, but under the totality of the circumstances, the minimal additional delay and threat caused by the Russolis, in addition to the lack of other factors justifying a use of force discussed above, the force allegedly used by the Officers was unreasonable.

If Plaintiffs' facts are accepted by the jury, Defendants could be found to have acted unreasonably. Of course the material facts concerning the extent of the use of force are disputed. We must deny the Officers' motion for summary judgment on the substance of the § 1983 excessive force claims brought under the Fourth and Fourteenth Amendments to the United States Constitution and leave this matter for the jury.

### 2. Qualified Immunity of the Officers

On the Plaintiffs' facts, they have sufficiently alleged the deprivation of their Fourth Amendment right to be free from unreasonable seizures. To determine whether the Officers have qualified immunity, we must ask whether a reasonable Officer could have believed the force used to be reasonable in light of clearly established law and the information he possessed. The reasonableness inquiries in the substance of the claim and in the determination of qualified immunity are identical. We have already determined that if the facts are as Plaintiffs allege, then the Officers' use of force could be unreasonable, so the existence of qualified immunity will depend on which view of the facts the jury accepts, including, inter alia, the Officers' belief in the extent of the bomb emergency and the amount of force actually used by the Officers. Therefore we cannot decide now whether the Officers are entitled to qualified immunity from the § 1983 excessive force claims brought under the Fourth and Fourteenth Amendments to the United States Constitution and must deny their motion for summary judgment as to those claims.

### D. False Imprisonment Claims

 Section § 1983 claims for false imprisonment are "based on the Fourteenth Amendment protection against deprivations of liberty without due process of law." *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir.1995) (citing *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433, (1979)). In *Baker*, the Supreme Court made it clear that a claim for false imprisonment cannot be based on an arrest based on probable cause. *See Baker*, 443 U.S. at 143–44, 99 S.Ct. 2689. If the police lack probable cause to make an arrest, however, "the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Groman*, 47 F.3d at 636 (citing *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir.1988)). A false imprisonment claim under § 1983 that is based on an arrest made without probable cause is grounded in the Fourth Amendment's guarantee against unreasonable seizures. *See id.* (citing *Barna v. City of Perth Amboy*, 42 F.3d 809, 820 (3d Cir. 1994); *Guenther v. Holmgreen*, 738 F.2d 879, 883 (7th Cir.1984), *cert. denied*, 469 U.S. 1212, 105 S.Ct. 1182, 84 L.Ed.2d 329 (1985)). Under a § 1983 claim for false imprisonment, the plaintiffs may seek damages " 'from the time of detention' up until the time they are released." *Robinson v. Radnor Township*, No. CIV. 98–

CV–5780, 1999 WL 619335 (E.D.Pa. Aug.16, 1999) (quoting *Townes v. City of New York,* 176 F.3d 138, 149 (2d Cir. 1999)), even for very short periods of restraint, *see Pritchard v. Perry,* 508 F.2d 423, 425 (4th Cir.1975). As we discussed previously, probable cause is a jury issue. *See* Part IV. B. 1, *supra.* We cannot judge the reasonableness of the Officers' belief in the existence of probable cause for the arrest of Mr. Russoli for purposes of qualified immunity without factual findings from the jury, *see* Part IV. B. 2. b., *supra,* but we have found that the Officers are entitled to qualified immunity for the arrest of Mrs. Russoli, *see* Part IV. B. 2. c., *supra.* Therefore, as to the § 1983 false imprisonment claims under the Fourth and Fourteenth Amendments to the United States Constitution, we find that the Officers are entitled to qualified immunity and we will grant partial summary judgment to the Officers as to the claim by Mrs. Russoli, and we must deny summary judgment as to the claim by Mr. Russoli, both on the substance of the claim and the question of whether or not the Officers are entitled to qualified immunity.

## E. Retaliatory or Malicious Prosecution Claims

### 1. Prima Facie Case

Count III of the Complaint alleges that the Defendants "maliciously and without probable cause" initiated a criminal proceeding against the Plaintiffs. (Compl.¶ 88.) It is clear that the initiation of a prosecution is done under color of state law. The Complaint does not make clear, however, the constitutional basis for the malicious prosecution claim, although the Complaint does make general allegations of violations of Plaintiffs' constitutional rights under the First, Fourth and Fourteenth Amendments.

Although it is clear that malicious prosecution is actionable under § 1983, the law governing the basis for such a claim is evolving. *Donahue v. Gavin,* No. Civ. A. 98–1602, 2000 WL 772819, at *2 (E.D.Pa. June 15, 2000). Prior to the Supreme Court's decision in *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), a plaintiff in this circuit alleging a § 1983 claim for malicious prosecution was required to show only the elements of the common law tort, *see Lee v. Mihalich,* 847 F.2d 66, 69–70 (3d Cir.1988). In *Albright,* the Supreme Court made clear that neither substantive due process nor the Fourteenth Amendment provided the constitutional peg on which to hang a malicious prosecution tort. *Albright,* 510 U.S. at 269–271, 114 S.Ct. 807. The plurality stated: "we hold that it is the Fourth Amendment and not substantive due process under which petitioner Albright's claim must be judged." *Albright,* 510 U.S. at 271, 114 S.Ct. 807. While some circuits have construed malicious prosecution claims to be based exclusively on the Fourth Amendment, the Third Circuit recently held that a § 1983 malicious prosecution claim could be based on a constitutional provision other than the Fourth Amendment, as long as it was not grounded in substantive due process. *Merkle v. Upper Dublin School District,* 211 F.3d 782, 791–793 (3d Cir. 2000); *Gallo v. City of Philadelphia,* 161 F.3d 217 (3d Cir.1998); *see also Donahue,* 2000 WL 772819 (collecting circuit cases interpreting *Albright*). Therefore, this Court will examine Plaintiffs' claims of malicious prosecution under both the Fourth and the First Amendment, since there could be no claim under the Fourteenth Amendment.

#### a. Fourth Amendment

Where a § 1983 claim for malicious prosecution is grounded in the Fourth Amendment, a plaintiff must establish the common law elements of the tort and a deprivation of liberty which is consistent with the concept of "seizure." *Torres v. McLaughlin,* 163 F.3d 169, 173, 174 (3d Cir.1998), *Gallo,* 161 F.3d at 222. Absent any constitutionally significant pretrial restraints on plaintiff's liberty, the weight of federal authority holds that a

person may not maintain a § 1983 claim for malicious prosecution based on the pretrial incarceration period. *See Brower v. County of Inyo,* 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1999) ("Seizure alone is not enough for § 1983 liability"); *Bristow v. Clevenger,* 80 F.Supp.2d 421, 430 (M.D.Pa.2000) (a Fourth Amendment violation does not occur every time a criminal complaint is filed without probable cause and any judicial proceeding ensues). *See also Johnson v. City of Chester,* 10 F.Supp.2d 482 (E.D.Pa.1998) (holding that being charged and prosecuted for Disorderly Conduct, 18 Pa. Cons.Stat. § 5503, is not a cognizable violation of Fourth Amendment rights); *Britton v. Maloney,* 196 F.3d 24 (1st Cir.1999) (holding that filing of baseless charges is not a seizure). The Plaintiffs were not held in jail and have not alleged any constitutionally significant pretrial restraints on their liberty. Moreover, in their Memorandum, Plaintiffs do not rely on the Fourth Amendment in connection with their malicious prosecution claim.[17] Therefore Plaintiffs' claims of malicious prosecution cannot be grounded in the Fourth Amendment. We now turn to the validity of the prosecution under the First Amendment.

*b. First Amendment*

 It is possible to construe Count III of Plaintiffs' Complaint as a claim of retaliatory prosecution brought under the First Amendment. *See Moore v. Valder,* 65 F.3d 189, 196 (D.C.Cir.1995) (distinguishing between malicious prosecution and retaliatory prosecution). To state a claim for retaliatory prosecution, a plaintiff must allege that (i) he has an interest protected by the First Amendment; (ii) the defendant's actions were motivated by or substantially caused by the plaintiff's exercise of that right; and (iii) the defendant's action effectively chilled the exercise of the plaintiff's First Amendment rights.

*Palma v. Atlantic Co.,* 53 F.Supp.2d 743, 752 (D.N.J.1999); *cf. Larsen v. Senate of the Commonwealth of Pennsylvania,* 154 F.3d 82, 94 (3d Cir.1998) (plaintiff must allege that the First Amendment activity was a "substantial motivating factor in the alleged retaliatory action"); *cf. Anderson v. Davila,* 125 F.3d 148, 161 (3d Cir.1997). Institution of a criminal action to penalize the exercise of one's First Amendment rights is a deprivation cognizable under § 1983. *Losch v. Borough of Parkesburg,* 736 F.2d 903, 907–908 (3d Cir.1984). Thus, the Complaint, which alleges that Defendants prosecuted the Russolis in retaliation for bringing suit against them, could be construed as a claim for retaliatory prosecution viable under § 1983. *See Moore,* 65 F.3d at 196 n. 12.

 Whether an activity is protected by the First Amendment is a question of law. *See Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995). We find that Plaintiffs have shown the existence of an interest protected by the First Amendment. The Supreme Court has consistently held that an individual's right of access to court is protected by the First Amendment's clause granting the right to petition the government for grievances. *See, e.g., California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). *See also Anderson,* 125 F.3d at 161. Otherwise permissible actions may be unconstitutional if they are taken in retaliation for filing of a lawsuit. *Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1177 (3d Cir.1990). Although a plaintiff must ordinarily show that his speech was a matter of public concern to qualify it as protected under the First Amendment, this requirement does not apply in cases where the speech itself constitutes the plaintiff's lawsuit. *See Anderson,* 125 F.3d at 162 (cit-

---

**17.** Plaintiffs neither cite the Fourth Amendment or discuss any case law on the malicious prosecution under the Fourth Amendment. We evaluated their claim here only because the Complaint could conceivably be read as requesting relief under the Fourth Amendment.

ing *San Filippo v. Bongiovanni*, 30 F.3d 424, 434–443 (3d Cir.1994)).

■ Having concluded that the Plaintiffs engaged in activity protected by the First Amendment, we must now turn to the question of whether the record reflects a material dispute of fact on the remaining two prongs. *See Watters*, 55 F.3d at 892. First, we must examine whether Plaintiffs sufficiently allege that the their protected activity was a "substantial motivating factor" for the Defendants actions. *See Larsen*, 154 F.3d at 94 (3d Cir.1998); *see also Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir.1988); *Wolford v. Lasater*, 78 F.3d 484 (10th Cir.1996). In response to a motion for summary judgment on a retaliation claim, the plaintiff may not respond simply with general attacks upon the defendant's credibility. *See Crawford–El v. Britton*, 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). The plaintiff must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden. *Id.*

Plaintiffs rely primarily on two facts. Their first supportive fact is that the disorderly conduct charge came after they commenced this suit. The second fact relied upon is that the charges were dismissed. While these facts themselves are not in dispute, two very different inferences could be drawn from them. We will first examine whether the timing of the charges supports Plaintiffs' conclusion that the Officers intended to retaliate against them.

In the Third Circuit, there is some confusion over whether timing alone is ever sufficient to show evidence of "substantial motivation." *See Delli Santi v. CNA Insurance Companies*, 88 F.3d 192, 199 (3d Cir.1996) (timing alone is insufficient to prove retaliatory motive); *Quiroga v. Has-*

*bro*, 934 F.2d 497 (1991) (no inference based on timing alone in employment discrimination context); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). In *Krouse*, the court declined to resolve the conflict directly but noted: "[e]ven if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be unusually suggestive before a causal link will be inferred." *Id.* Since *Krouse*, most Third Circuit cases have required a showing of temporal proximately along with other evidence to establish a retaliation claim. *See, e.g., · Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir.2000) (employment retaliation case); *Landmesser v. United Air Lines, Inc.*, 102 F.Supp.2d 273, 278 (E.D.Pa.2000) (inferences that can be drawn from the temporal sequence of events insufficient to state claim).[18]

Regardless of whether timing alone is ever sufficient, there is a enough evidence from which a reasonable jury could infer that the decision to file criminal charges was substantially motivated by Plaintiffs' filing suit. The Defendants argue that the decision to charge the Russolis was made on the day of the incident and that the delay was to determine which charges would be most appropriate. (Defs.' Ex. M (A. Stiles Dep. at 58.)) While delays between an incident and the filing of criminal charges are common, the length of the delay in these circumstances could be suggestive of a retaliatory motive. The underlying conduct was not so obscure or complicated that four consultations with two Assistant District Attorneys and three weeks' time were necessary to determine the proper charges. (*See* Pls.' Ex. 2 (Report of Walter Connery.)) Moreover,

18. In evaluating the causation requirement, we have relied in part on upon cases that deal with First Amendment retaliation suits under § 1983 in the employment context. With regard to the first two elements, the tests are the same. *Compare Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 793 (3d Cir.2000) (Plaintiff must demonstrate: (1) that his or her speech was protected; (2) that his or her speech was a motivating factor in the retaliation. The burden then shifts to the Defendants to establish that it would have taken the same adverse action against the Plaintiff even in the absence of her protected speech.), *with Palma v. Atlantic Co.*, 53 F.Supp.2d 743, 752 (D.N.J.1999) (discussed *supra* ).

Plaintiffs produced evidence that Officers Anderson and Soberick knew of the lawsuit prior to making their decision to file charges. (A. Stiles Dep. at 58.) It may be that the delay was entirely justified, but that is a question for the jury, not for this Court. *See Azzaro v. County of Allegheny*, 110 F.3d 968, 975 (3d Cir.1997).

In addition to the unusually suggestive timing, Plaintiffs also point out that the Disorderly Conduct charges were dismissed at the close of the Prosecution's case. The fact that the Prosecution was unable to make out a prima facie case supports Plaintiffs' inference the charges were not filed because of their conduct on May 19, but because of the filing of this lawsuit. Certainly, dismissal of the underlying charges does not give grounds for a § 1983 claim in every instance. However, viewing the record as a whole, we believe Plaintiffs have put forth sufficient evidence to raise a genuine issue of material fact as to whether the institution of this lawsuit was a motivating factor in the decision to file Disorderly Conduct charges. Consequently, Plaintiffs have satisfied this second requirement for establishing a First Amendment retaliation claim.

There is some dispute about whether a plaintiff must allege that the defendant's actions effectively chilled the exercise of First Amendment rights. *Compare Anderson*, 125 F.3d at 163 n. 15, *with Palma*, 53 F.Supp.2d at 752. In *Anderson*, the court noted a distinction between claims alleging retaliation for activities protected under the First Amendment and claims alleging interference with a person's right of access to the courts. *Id.* at 163 n. 15. With retaliation claims, a plaintiff is not required to demonstrate that his speech has been "sufficiently chilled." *Id. Anderson* noted that there may be a separate theory of recovery if a plaintiff demonstrates that the defendant interfered with or threatened the ability to continue with a lawsuit. *Id.* In their Complaint and Memorandum, Plaintiffs allege both that the Defendants retaliated against them for filing the lawsuit and that the filing of criminal charges hindered their access to the courts. (Compl. at 9.) Plaintiffs discuss their claims interchangeably, however. To the extent that their complaint may be construed as seeking recovery on a right of access claim, we will address whether the Defendants' actions "chilled" Plaintiffs' First Amendment rights.

A plaintiff may not recover merely on the basis of a speculative chill due to generalized and legitimate law enforcement initiatives. *Palma*, 53 F.Supp.2d at 753 (quoting *Mendocino Environmental Center v. Mendocino County*, 14 F.3d 457, 464 (9th Cir.1994)). Plaintiffs allege that the filing of Disorderly Conduct charges hindered their access to the courts (Compl. at 9.), but they allege no facts to support this allegation. First, Plaintiffs have not alleged that the charges were instituted for the purpose of forcing them to dismiss their claims. Second, Plaintiffs had already filed their suit prior to the institution of the criminal charges; thus, the filing of charges could not have interfered with the institution of this suit. Third, Plaintiffs have not alleged that defending themselves against the criminal charges interfered with their ability to maintain this action. Because Plaintiffs have not shown any facts supporting their singular allegation that the filing of the Disorderly Conduct charges impeded this suit, there has been no chilling effect on their First Amendment rights. Accordingly, to the extent that Count III alleges that there has been a violation of the right of access to the courts guaranteed under the First and Fourteenth Amendments to the United States Constitution, we will grant partial summary judgment to the Officers. The retaliation claim does not require a showing of the chilling of Plaintiffs' First Amendment rights, and Plaintiffs have made out a prima facie case on the other elements. Therefore the First Amendment retaliation claim will proceed to a

jury unless the Officers have qualified immunity, a question we will now consider.

## 2. Qualified Immunity on the Retaliation Claim

■ As set forth above, Plaintiffs have sufficiently asserted violations of their First Amendment rights. Therefore we must next determine whether the Officers are entitled to qualified immunity on the grounds that their conduct "did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Larsen v. Senate of the Commonwealth of Pennsylvania,* 154 F.3d 82, 86–87 (3d Cir.1998) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727).

First Amendment claims for retaliation pose particularly difficult analytical problems for the Court. On the one hand, Plaintiffs have a clearly established right to petition the government in the manner that they did and to be free from retaliatory prosecution for exercising that right. *See Losch,* 736 F.2d at 909–910. There is no ambiguity in the law guaranteeing the Plaintiffs' First Amendment right to petition the government for redress of grievances. *See, e.g., California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Losch,* 736 F.2d at 910 (prosecution of a citizen in retaliation for "nonprovocatively voicing his objection" to police conduct impermissibly punishes constitutionally protected speech). The fact that the right to be free from retaliation is clear, however, does not resolve the immunity question, because an essential element of a First Amendment retaliation claim is the defendant's subjective motivation. *See Larsen,* 154 F.3d at 94. In this case, that

determination turns on an inquiry into whether "officials reasonably could be believe that their motivations were proper even when their motivations were in fact retaliatory." *Id.*

■ A bare allegation of retaliatory motive is not necessarily sufficient to defeat an assertion of qualified immunity as to retaliation claim. *Larsen,* 154 at 94. In some circumstances, the legitimate basis for the actions might be so apparent that the allegation of a retaliatory motive is insufficient to preclude a grant of qualified immunity. *Id.* However, Defendants have not undisputedly demonstrated that their motivations were fair. *See Lloyd v. Jefferson,* 53 F.Supp.2d 643, 681 (D.Del.1999); *St. Germain v. Pennsylvania Liquor Control Bd.,* No. Civ. A. 98–5437, 2000 WL 39065, at *6 (E.D.Pa. Jan.19, 2000); *Watford v. Lincoln Univ. of the Commw. Sys. of Higher Educ,* No. Civ. A. 98–5252, 2000 WL 862822, at *5 (E.D.Pa. June 28, 2000). A jury could believe that they filed charges not because of the incidents on May 19, but because Plaintiffs instituted this lawsuit and the Officers wanted to retaliate. If a jury were to make this determination, it would likely follow that Defendants could not have believed that such retaliatory activity was proper. *Id.* Thus, at this point, factual disputes preclude us from ruling on whether Officers Anderson and Soberick are entitled to qualified immunity.[19] We will deny without prejudice the motions of Officer Anderson and Officer Soberick for summary judgment on the basis of qualified immunity from the § 1983 claims for retaliatory prosecution under the First and Fourteenth Amendments to the United States Constitution.[20]

---

**19.** As we have stated previously, we are aware that the issue of qualified immunity should be decided as early in the litigation as possible. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). When material facts are in question, however, summary judgment is inappropriate. *Sharrar v. Felsing,* 128 F.3d 810, 828 (3d Cir.1997). *See also Angle v. Sabatine,* No. Civ.A. 96–CV–

6446, 1998 WL 54400, at *8 (E.D.Pa. Jan.27, 1998).

**20.** It may be that at the end of Plaintiffs' case, it will be found that the true motivation for the conduct was not to retaliate for the protected activity. Defendants could then make a motion for judgment as a matter of law. *See Palma,* 53 F.Supp.2d at 769; *Larsen,* 154 F.3d at 94.

The First Amendment retaliation claims will proceed to a jury.

## F. Abuse of Process Claims

 Count IV of the Complaint alleges abuse of process against all Defendants under § 1983 and state law. Because the elements necessary to establish a claim for abuse of process claim under Pennsylvania tort law and 42 U.S.C. § 1983 are the same, we will address them together here. *See Bristow v. Clevenger,* 80 F.Supp.2d 421 (M.D.Pa.2000); *McGee v. Feege,* 517 Pa. 247, 535 A.2d 1020 (1987). A § 1983 claim for malicious abuse of process lies where prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law. *Williams v. Fedor,* 69 F.Supp.2d 649, 673 (M.D.Pa.1999) (quoting *Jennings v. Shuman,* 567 F.2d 1213, 1217 (3d Cir. 1977)). *See also Rose v. Bartle,* 871 F.2d 331, 350 (3d Cir.1989). Abuse of process involves a perversion of a process after it is issued. *Jennings,* 567 F.2d at 1218; *Bristow,* 80 F.Supp.2d at 421. In *McGee,* the Pennsylvania Supreme Court articulated the distinction between malicious prosecution and abuse of the criminal process: malicious prosecution has to do with the wrongful initiation of criminal process, but abuse of process is concerned with a perversion of a process after it is issued. 535 A.2d at 1023 (citations omitted). Examples of actions for which recovery may be had under the abuse of process tort include extortion by means of attachment, execution or garnishment, and blackmail by means of arrest or criminal prosecution. *See Bristow,* 80 F.Supp.2d at 431 (collecting cases). To establish a claim for abuse

of process, there must be some proof of a "definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of process." *Williams,* 69 F.Supp.2d at 673. There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. *Cameron v. Graphic Management Assoc., Inc.,* 817 F.Supp. 19, 21 (E.D.Pa.1992); *Di Sante v. Russ Financial Co.,* 251 Pa.Super. 184, 380 A.2d 439, 441 (1977).

 In the instant action, Plaintiffs do not allege facts that support a claim for abuse of process. They do not maintain that the criminal action against them was initiated legitimately and then "perverted." They have not produced any evidence that Defendants desired or demanded anything other than the action's authorized conclusion—criminal conviction.[21] There is no evidence of any extortion or blackmail. Plaintiffs have not produced evidence that would support the common law tort of abuse of process. Accordingly, we will grant partial summary judgment to all Defendants on Plaintiffs' abuse of process claims brought under both § 1983 and Pennsylvania law.[22]

## G. Defamation Claims

Count VII of the Complaint asserts § 1983 claims against all Defendants for defamation, and Count IX incorporates the defamation claim into the general § 1983 claim against the Township. Mr. Russoli alleges that Officer Anderson stated to Mr. Russoli's neighbors, Doris and Dale Smith, that Mr. Russoli was drunk and that this

---

**21.** To the extent that Plaintiffs argue that Defendants pursued the criminal action out of malice or in order to harass them, this represents the basic difference between malicious prosecution and abuse of process. The goal of malicious prosecution is the bringing of the action itself, while the goal of abuse of process is something entirely different. *See Bristow v. Clevenger,* 80 F.Supp.2d 421 (M.D.Pa. 2000); *Jennings v. Shuman,* 567 F.2d 1213, 1218 (3d Cir.1977) (discussing the distinction); *McGee v. Feege,* 517 Pa. 247, 535 A.2d

1020 (1987) (pointing out that there is often confusion between the two).

**22.** Even if the Officers were liable for abuse of process, liability could not have been imposed against Salisbury Township because Plaintiffs have not identified any relevant policies, practices, or customs of the Township. *See Telepo v. Palmer,* 40 F.Supp.2d 596, 613–615 (E.D.Pa.1999).

statement resulted in damage to his reputation. Plaintiffs also allege that their reputations were damaged by statements made by Chief Stiles to *The Morning Call* newspaper and published by that newspaper.[23]

■ Any statements made by the Officers or Chief Stiles in the course of their duties would clearly be made under color of state law. In order to establish a claim for defamation under § 1983, Plaintiffs must demonstrate a violation of a constitutionally protected interest, and this they have failed to do. Plaintiffs assert that their reputations were damaged, but they offer little evidence of such damage. Even if they did have sufficient evidence, damage to reputation alone does not rise to the level of a constitutional violation. *See Paul v. Davis*, 424 U.S. 693, 708–10, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding that injury to reputation alone is not a deprivation of liberty or property cognizable under the Fourteenth Amendment). If the damage to reputation were so great that it significantly limits either the person's associational or employment opportunities, there is a deprivation of liberty. *See Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Plaintiffs have neither alleged nor pointed to evidence of such damage. Because the Plaintiffs have failed to allege the deprivation of a constitutional right resulting from the alleged defamatory statements, we will grant partial summary judgment to Officers Anderson and Soberick as to the § 1983 defamation claims under the United States Constitution.

## H. Interference with Family Relationship Claims

Plaintiffs allege in Count VIII of their amended Complaint that their constitutional rights have been violated through Defendants' "interference with [their] family relationships." Neither the Complaint nor the Plaintiffs' Memorandum opposing Defendants' Motion for Summary Judgment specifies which of Plaintiffs' constitutional rights were violated by such alleged interference, but the Complaint does aver generally that Plaintiffs' Fourteenth Amendment rights were violated. We will therefore examine this claim as one for a deprivation of liberty without due process of law as protected by the Fourteenth Amendment.

The Supreme Court has held that marriage is an intimate relationship protected as a fundamental right as a part of the "liberty" protected by the Fourteenth Amendment, but the Court's cases on marriage deal with the right to initiate, continue, terminate, or make decisions relating to marital relationships without undue burdens from the state, not with forced temporary separations of spouses. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (striking down law restricting freedom of choosing whom to marry based on race); *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (invalidating a statute requiring payment of court costs before obtaining access to the courts as applied to indigents seeking a divorce); *Zablocki. v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (striking law conditioning right to marry on payment of child support). Family relationships are also protected. *See, e.g., Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (upholding right of parents to make educational decisions for their children); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (same); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (granting significant procedural protections to parents before the state may sever the parent-child relationships). Plaintiffs cite

---

**23.** Chief Stiles is not a named party to this action, and therefore his statements could only be relevant as to whether Salisbury Township has an official policy, practice, or custom of depriving people of their constitutional rights by making defamatory statements.

only *Meyer, Pierce, Santosky,* and *Franz v. United States,* 707 F.2d 582 (D.C.Cir. 1983) (providing procedural and substantive protection to a father whose relationship with his children was severed when the children and their mother were placed in the federal witness protection program), for their proposition that Defendants have in some way unconstitutionally interfered with the Russolis' family relationship, but these cases are inapposite because they deal only with the parent-child relationship.

■ Plaintiffs have failed to specify which facts are the basis of their claim or point to evidence of any interference with their family relationship. It appears from the Complaint, Plaintiffs' Memorandum, and the record that the Russolis were separated from each other for at most two hours while under arrest, but they were then taken to the police station, processed, and released together. On these facts there was no prolonged separation or permanent interference with the family relationship.

Plaintiffs allege that they have suffered pain, stress, and anxiety as a result of Defendants' actions, but they do not explain what effect this has had on their marital relationship or how a negative effect, if there were one, would rise to the level of a constitutional violation. The Russolis both indicated in their depositions that the ordeal has had a long-term physical, mental, and emotional effect on Mrs. Russoli. Mr. Russoli stated that the ordeal affected Mrs. Russoli to such an extent that their marital relationship has been affected, but does not say how.

Because the Plaintiffs have pointed to no law, and we can find none, that such a separation is a deprivation of liberty or other constitutional violation, or to any other facts and law establishing a prima facie case of a constitutional violation to support a § 1983 claim for interference with their family relationship, we will grant partial summary judgment to the Officers on Plaintiffs' constitutional claim

of interference with their family relationship.

## I. Claims Against Salisbury Township

### 1. Background

■ Generally, a municipality cannot be held liable unless one of its employees is "primarily liable under Section 1983 itself." *Williams v. Borough of West Chester,* 891 F.2d 458, 467 (3d Cir.1989); *see also City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) (holding that a municipal entity cannot be held liable under the Fourth Amendment if there is no underlying constitutional violation by the individual officer). A municipality cannot be liable under § 1983 liability under a respondeat superior theory: "[i]nstead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff must identify the challenged policy, attribute it to the municipality itself, and show a causal link between execution of the policy and injury suffered. *Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir.1984).

The Third Circuit has carefully distinguished *Heller* by holding that in cases in which plaintiffs allege that their Fourteenth Amendment substantive due process rights were violated, a municipality can be held independently liable for violating a plaintiff's constitutional rights even if there is no individual liability on the part of the officer. *Fagan v. City of Vineland,* 22 F.3d 1283 (en banc), *aff'd in part* 22 F.3d 1296 (3d Cir.1994) (holding that "in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution"). In *Heller,* the Court reversed the

verdict against the city because it was inconsistent with the jury finding in favor of the officer: "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." 475 U.S. at 799, 106 S.Ct. 1571; *see also Williams v. Borough of West Chester,* 891 F.2d 458 (3d Cir.1989). The *Fagan* court distinguished *Heller* as being brought under § 1983 for violations of the Fourth Amendment, whereas the claim in *Fagan* was for violation of the Fourteenth Amendment's substantive due process protection. *See Fagan,* 22 F.3d at 1292. The Third Circuit also noted that the plaintiff had brought a separate and independent constitutional claim against the municipality, unlike in *Heller,* which was based on a theory of respondeat superior. *Id.* Finally, the court stated that finding municipal liability independent of its officers is not logically inconsistent because the claims in *Fagan* were "based on different theories and require proof of different actions and mental states." [24] *Id.; see also Simmons v. City of Philadelphia,* 728 F.Supp. 352, 357 (E.D.Pa.1990), *aff'd,* 947 F.2d 1042 (3d Cir. 1991). Therefore to the extent that Plaintiffs allege that their substantive due process rights have been violated and Officers Anderson and Soberick are not liable for constitutional violations, we will examine whether, under the holding in *Fagan,* Salisbury Township may be liable for constitutional torts caused by its own policies. We will also examine whether or not the facts would support Township liability if the Officers are found liable for constitutional violations.

 Actions taken by individuals with final authority for making a decision are official policy. "Municipal liability under § 1983 attaches where—and only

where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Whether a person is a policy-maker is a question of law for the judge to decide, not of fact for the jury. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality). The court should consider state and local law and "custom or usage having the force of law" to determine whether a person is a policymaker. *Jett,* 491 U.S. at 737, 109 S.Ct. 2702. After the court has identified the policymaker, "it is for the jury to determine whether [the policymaker's] decisions have caused the deprivation of rights at issue by policies that command that it occur ... or by acquiescence in a long-standing practice or custom which constitutes the standard operating procedure of the local government entity." *Id.* (citations omitted). The Third Circuit has explained that

> Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" as to virtually constitute law.

*Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir.1996) (quoting *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (citations omitted)).

 A municipality's inaction, specifically its failure to train or supervise

---

24. We note that other circuit courts have explicitly disagreed with the Third Circuit in *Fagan. See, e.g., Evans v. Avery,* 100 F.3d 1033, 1039–40 (1st Cir.1996); *Thompson v. Boggs,* 33 F.3d 847, 859 n. 11 (7th Cir.1994).

They reject the holding in *Fagan* and broadly apply the principle elucidated in *Heller* that a municipality cannot be held liable absent a constitutional violation by its officers. *Id.*

officers adequately or failure to respond to complaints about the allegedly unconstitutional acts of officers, can also be an official policy subjecting it to § 1983 liability. In *City of Canton v. Harris,* the Supreme Court held that proof of "deliberate indifference [by the local government] to the rights of persons with whom the police come into contact" is required for inadequate training to be the basis of liability. 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In other words, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389, 109 S.Ct. 1197. A conclusion that failure to train was a result of deliberate indifference would be justified in at least two circumstances: (1) a constitutional violation was a foreseeable consequence of, and very likely to occur as a result from, the failure to train adequately, i.e. there was an obvious need for more or different training, such as in the case of the use of firearms or deadly force, and (2) the municipality repeatedly received similar complaints of constitutional violations by its officers and still failed to act. *See id.* at 390, 109 S.Ct. 1197; *see also Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 407–08, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Carter v. City of Philadelphia,* 181 F.3d 339, 357 (3d Cir.1999) (requiring showing of deliberate indifference for claim of failure to train or supervise) (citing *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989) (requiring a showing that harm occurred on numerous previous occasions and officials failed to respond appropriately, or that risk of harm is great and obvious, in order to establish deliberate indifference)). The Third Circuit has "held that a failure to train, discipline or control can only form the basis for Section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone,* 159 F.3d 120, 127 (3rd Cir. 1998) (citing *Bonenberger v. Plymouth Township,* 132 F.3d 20, 25 (3d Cir.1997)). The Third Circuit has also applied, but not expressly adopted, a three-Part test from *Walker v. City of New York*: "in order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter,* 181 F.3d at 357 (citing *Walker,* 974 F.2d 293, 297–98 (2nd Cir.1992)) (applying *Walker* test to facts similar to those in *Walker*-alleged perjury by police officers). Plaintiffs must also prove that the deficiency in training or supervision " 'actually caused the police officers' indifference" to the individual's constitutional rights, *Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir.1996) (quoting *Canton,* 489 U.S. at 391, 109 S.Ct. 1197). In *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Supreme court states that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." The Court emphasized that

> The plaintiff must also demonstrate that, though its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct casual link between the municipal action and the deprivation of federal rights.

*Id.* at 404, 117 S.Ct. 1382.

## 2. Unlawful Arrest, Excessive Force and False Imprisonment

 Plaintiffs, in their Memorandum opposing Defendants' Motion for Summary

Judgment, failed to address the possibility of municipal liability for the alleged unlawful arrests of and excessive force used against the Russolis. Their expert report, however, alleges that Salisbury Township has a policy, practice, or custom related to arrests and use of force that shows that the Township is deliberately indifferent to the Fourth and Fourteenth Amendment rights of persons within the Township.[25] (Connery Rep. at 18–23.) Because the Memorandum purports to incorporate the expert report, we will consider the arguments made in the report.

Plaintiffs assert that the Township lacks an impartial complaint investigation system and fails to adequately supervise, instruct, and discipline its officers. Plaintiffs assert that a lack of a formal policy for "consultation and contemporaneous reviews and approval" of officers' actions "is a built in Fourth and Fourteenth Amendment violation hazard" because the "basic control elements that would deter unconstitutional conduct are absent." (Connery Rep. at 20–21.) Plaintiffs assert that these failures show a deliberate indifference on the part of the Township to the rights of individuals, because police officers have no reason to expect or fear meaningful review of their actions.

The policies challenged here relate to the review of all interactions of the Township's police officers with individuals in the community, therefore if the Officers are liable on any of the § 1983 claims directly stemming from the arrests or force used during the arrests, and the Township's policies "subject[ed] or cause[d] [the Plain-

tiffs] to be subjected" to the constitutional violations underlying the § 1983 claims, the Township will be liable under § 1983.[26]

The Township does have a written policy as to arrests without a warrant that authorizes officers to "make on view arrests without a warrant upon probable cause where there is ongoing conduct that 'imperils the personal security of any person or endangers public or private property' for violation" of several provisions of the Pennsylvania crime code, including disorderly conduct. (Arrest Without Warrant Policy.) The policy authorizes officers to transport individuals to a police facility and detain them until they can be identified, processed, cited and released. (*Id.*) The Township also has a written policy for the use of force that authorizes officers to use non-deadly force to the extent necessary to "de-escalate the incident and bring it under control" but only "to protect themselves or another from harm; to restrain or subdue a resistant individual; or to bring an unlawful situation safely and effectively under control." (Use of Force Policy.) Plaintiffs' concern is not with these printed policies, but instead with the failure of the Township to have a formal impartial mechanism for reviewing the actions of officers and with the failure of the Township to adequately supervise, instruct, and discipline officers.

The Township does not have a civilian complaint review board or an internal affairs unit to investigate complaints of improper arrests and excessive use of force. (Connery Rep. at 18; Stiles Dep. at 23, 25–

---

**25.** Plaintiffs have not produced evidence or made arguments specifically on the false imprisonment claim. Because a false imprisonment claim is derivative of an unlawful arrest claim, we will treat the false imprisonment claim against the Township as being incorporated into the arguments as to policies regarding arrests.

**26.** Salisbury Township cannot be liable for its policies leading to the arrest of Mrs. Russoli because its employees, Officers Anderson and Soberick, are entitled to qualified immunity for her arrest. *See City of Los Angeles v.*

*Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam); *Williams v. Borough of West Chester*, 891 F.2d 458, 467 (3d Cir.1989); Part IV. B. 2. c., *supra*. *Heller* and *Williams* are applicable because the arrest is challenged under the Fourth Amendment, and *Fagan v. City of Vineland*, 22 F.3d 1283 (en banc), *aff'd in part* 22 F.3d 1296 (3d Cir.1994), which would allow municipal liability even if the Officers were not liable, applies only to acts challenged under substantive due process.

28.) Instead, a designated detective, who regularly works with the officers he may be called upon to investigate, conducts all investigations into complaints and reports his findings to Chief Stiles. (*Id.*) The detective and the Chief decide on the appropriate action to be taken. (Connery Rep. at 18; Stiles Dep. at 29.) Only if the disciplinary action goes beyond a written reprimand is an outside review made, namely by the Civil Service Commission, and then only if the officer appeals the action to be taken against him. (*Id.*) Plaintiffs assert that not only is such a system not impartial, but the procedures used by the detective are inadequate. (Connery Rep. at 19.) For example, the Plaintiffs allege that the Township failed to properly investigate a complaint by David Vasquez that Officer Anderson had used excessive force in another jurisdiction after Salisbury Township police had been called in to assist. (Connery Rep. at 19, Stiles Dep. at 35.) The detective reviewed the arrest report, interviewed Officer Anderson and the other officers involved, and probably interviewed civilians. (Stiles Dep. at 36–38.) Plaintiffs assert that such an investigation was inadequate because the detective may not have interviewed the civilian witnesses, did not review the facts of the civil suit complaint, and was inherently biased in favor of officers, (Connery Rep. at 19–20), but Plaintiffs present no evidence of their allegations.

Plaintiffs also allege that Salisbury Township police officers are improperly supervised, instructed, and disciplined. There is no formal feedback given to officers about the performance of their duties such as an annual or semi-annual performance review. (Stiles Dep. at 23.) Instead, Chief Stiles provides officers with informal feedback and extra training on a case-by-case basis when he considers such feedback or training to be necessary. (Stiles Dep. at 24.)

As an example of improper supervision, Plaintiffs point to Chief Stiles handling of the Russoli case. During the week of the incident, Chief Stiles had a conversation about the arrest, but did not advise the Officers on how to proceed. Instead, Chief Stiles "listened to what they had to say about what happened, after I read their report. I did discuss the case with them. I asked them how they wanted to proceed." (Stiles Dep. at 50.) Plaintiffs allege that the Chief, not the Officers, should have made the decision how to proceed and based his decision on an objective review of all available information. (Connery Rep. at 20.) Chief Stiles, however, in the next sentence of his deposition, testified that he asked the Officers how they wanted to proceed because, as the officers on the scene, they had the most information about the incident. (Stiles Dep. at 50.) Plaintiffs allege that by ignoring sources of information other than Officers Anderson and Soberick, "Salisbury Township and its Police Department virtually guaranteed that no meaningful supervision or discipline would take place." (*Id.*)

Chief Stiles allegedly based his evaluations of the propriety of Officer Anderson's actions and any disciplinary action required in both the Vasquez and Russoli cases on conversations with Officer Anderson and on his report, but not on interviews with complainants or civilian witnesses. Plaintiffs allege that Chief Stiles thereby abdicated his supervisory responsibility, and such abdication "is only made possible by an institutional lack of concern for the protection of civil rights and the Fourth and Fourteenth Amendment rights of citizens." (Connery Rep. at 23.)

Because the Plaintiffs are alleging that the inadequacy of the Township's policies led to the deprivation of their constitutional rights, *City of Canton v. Harris* and its progeny are applicable here. Although the Plaintiffs argue that the Township was deliberately indifferent, they fail to present evidence that a constitutional violation was a likely and obvious result of the Township's failures or that the Township repeatedly received similar complaints of

constitutional violations by its officers and still failed to act, as required by *City of Canton.* They also fail to meet the related requirements of *Montgomery v. De Simone.* They have presented no evidence that the Township, or its putative policymaker Chief Stiles,[27] contemporaneously knew about the Russoli incident or had knowledge of a prior pattern of similar incidents. At best, on the evidence referred to by Plaintiffs, Chief Stiles knew of one other incident—the Vasquez case. One prior incident fails to fulfill the *City of Canton* requirement of repeated similar complaints or the *Montgomery* requirement of a pattern.[28] Plaintiffs have alleged "circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate,"[29] *Montgomery v. De Simone,* 159 F.3d at 127, but satisfying one prong of the test is insufficient. Further, given such a low incidence of complaints, and the existence of written policies, ad hoc training, and required annual training,[30] we must find as a matter of law that a constitutional violation was not a likely and obvious result of the Township's alleged failures to train, instruct, or discipline officers.

Therefore there is not sufficient evidence that the Township has a policy or custom of being deliberately indifferent to residents' Fourth and Fourteenth Amendment rights, and that such policy or custom caused injury to the Plaintiffs, for the Plaintiffs' § 1983 claim against the Township as to the arrest of Mr. Russoli and the excessive force against both Mr. and Mrs. Russoli to withstand the Township's motion for summary judgment. We will grant partial summary judgment as to Plaintiffs' unlawful arrest, excessive force, and false imprisonment claims against Salisbury Township under the Fourth and Fourteenth Amendments to the United States Constitution.

### 3. Retaliatory or Malicious Prosecution

We find that the Salisbury Township ("Township") is entitled to partial summary judgment on the retaliatory prosecution claim. There is no evidence of any policy or practice of the Township operating against the Plaintiffs. Plaintiffs have

---

27. There is some evidence that Chief Stiles is a policymaker for Salisbury Township. The written arrest and use of force policies are printed on "Township of Salisbury" letterhead and are promulgated pursuant to the order of, and signed by, Chief Stiles. Chief Stiles is also the final decision maker as to whether officers require training or discipline as a result of their actions in the field. (*See* Stiles Dep. at 24, 29; discussion *supra.*) We need not decide whether Chief Stiles is a policymaker for the Township, however, because Plaintiffs have not even alleged that he is a policymaker.

28. Plaintiffs' expert report also refers to a third incident but does not identify, describe, or point to record evidence regarding it. (Connery Rep. at 19.) Our review of Chief Stiles' deposition reveals that the third case was a complaint by Meredith Parker. (Stiles Dep. at 34.) Plaintiffs' counsel failed to develop the record, however, because he was personally knowledgeable about it—his firm is, or was, involved in the Parker case. (*Id.* at 34–35.) There may have been a conflict or ethical concerns, or it may be that the reason

that Plaintiffs' counsel did not pursue this line of questioning in Chief Stiles' deposition, or otherwise develop and provide the record to this Court, is that it would not have been helpful to his client's case. In any event, even if the record had contained evidence of a second similar incident prior to that involving the Russolis, there would not necessarily be a sufficient pattern or number of incidents to show deliberate indifference. We need not decide, however, whether two such prior incidents would meet the *City of Canton* or *Montgomery* standards, because Plaintiffs failed to point to record evidence of a second incident.

29. We can infer on these facts, and in light of the summary judgment standard as to facts, that Plaintiffs have satisfied this prong.

30. Pennsylvania's Police Training Act requires each officer to undergo 12 hours of training each year, and Officers Anderson and Soberick have fulfilled their requirements each year they have been a member of the Salisbury Township police force. (Stiles Dep. at 10–20.)

not produced any evidence that the Township was deliberately indifferent to citizens' rights. They identify no policies or customs used by the Township that caused them an injury. Plaintiffs do not identify a particular aspect of a failure to train that evidences the Township's deliberate indifference or the causal link between an alleged failure to train and the injury to the Plaintiffs. The record does not reflect evidence of similar civil rights violations of other persons allegedly committed by officers of the Department. Plaintiffs have failed to show both "contemporaneous knowledge" of the allegedly offending incident or "knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval." *Montgomery v. De Simone,* 159 F.3d 120, 127 (3d Cir.1998). *See also Telepo v. Palmer Township,* 40 F.Supp.2d 596, 613 (E.D.Pa.1999).

▇▇▇▇▇ The only fact that Plaintiffs rely upon is that Officer Anderson reviewed the case with Officer Soberick, Chief Stiles and the Lehigh County District Attorney's Office. (Compl. at 21 (citing Def. Ex. F, Answer to Interrog. 2(b))). This is insufficient to constitute a municipal policy within the meaning of *Monell.* *See Losch,* 736 F.2d at 911. Even if police conduct is illegal, a policy cannot ordinarily be inferred from a single instance of illegality. *Id.* Although "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances", *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), there is little evidence that any of the individuals mentioned is actually a policymaker for Salisbury Township and thus that the decision to prosecute the Russolis can be said to have been made by the Township.[31] To impose municipal liability upon the Township, it is not enough for the Plaintiffs to show that a particular officer acted unsatisfactorily, because the officer's shortcomings may have resulted from factors other than a faulty training program. *See City of Canton v. Harris,* 489 U.S. 378, 390–391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Telepo,* 40 F.Supp.2d at 614. Even a plaintiff's proving that his injury could have been avoided through more or better training is not enough to support a § 1983 claim. *Id.*

Because Plaintiffs have identified no such policies or customs, they necessarily cannot show causation sufficient to impose liability on the Township. *See Losch,* 736 F.2d at 911. Even assuming that Officers Anderson and Soberick violated Plaintiffs' constitutional rights, there can be no municipal liability, and therefore we will grant partial summary judgment to Salisbury Township on Plaintiffs' § 1983 retaliatory prosecution claims under the First and Fourteenth Amendments to the United States Constitution.

### 4. Other Claims

We believe that partial summary judgment should be granted with respect to Plaintiffs' right of access to the courts, abuse of process, defamation, and interference with family relationship claims against Salisbury Township under the United States Constitution. Plaintiffs have not even made out a prima facie case against any of the Township's employees on these claims, and a municipality cannot be liable unless one of its employees is primarily liable. *See City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam); *Williams v. Borough of West Chester,* 891 F.2d 458, 467 (3d Cir.1989); Parts IV. E., F., G., and H., *supra.* Even if we construed these claims to have been brought under a substantive due process theory, thus allowing municipal liability without a constitutional violation by a municipal em-

---

**31.** There is some evidence that Chief Stiles is a policymaker for the Township, *see* n. 27, *supra,* but Plaintiffs have pointed to no evidence that Chief Stiles caused the prosecution of the Plaintiffs.

ployee, *see Fagan v. City of Vineland,* 22 F.3d 1283 (en banc), *aff'd in part,* 22 F.3d 1296 (3d Cir.1994), we would grant partial summary judgment. Plaintiffs have neither argued nor presented evidence in their Memorandum that Salisbury Township has a policy, practice, or custom of interfering with access to the courts, abusing process, defaming persons, or interfering with family relationships at all, let alone one that shows that the Township is deliberately indifferent to the constitutional rights of persons within the Township. We will therefore grant partial summary judgment as to Plaintiffs' constitutional claims against Salisbury Township for interfering with access to the courts, abuse of process, defamation, and interference with family relationships.[32]

## V. STATE LAW CLAIMS

We now turn to address Plaintiffs' claims arising under state law. As we noted previously, these claims are before us pursuant to our power to exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Defendants seek judgment in their favor on all of Plaintiffs' state law claims.[33]

### A. Salisbury Township and Salisbury Township Police Department

Salisbury Township and Salisbury Township Police Department argue that Plaintiffs' pendent state law claims are barred by the statutory defense of governmental immunity under the Pennsylvania Tort Claims Act, 42 Pa. Cons.Stat. Ann. § 8541 et. seq., which grants broad immunity to local agencies and their employees. Under the Act, local agencies are not liable for injuries caused by their own acts or the acts of their employees that constitute "a crime, actual fraud, actual malice or wilful misconduct," or for negligent acts unless they fall within one of eight categories.[34] 42 Pa. Cons.Stat. Ann. § 8542(a). "Local agency" is defined as "a government unit other than the Commonwealth government," 42 Pa. Cons.Stat. Ann. § 8501, and both the Township and the Police Department are clearly local agencies. *See, e.g., Doby v. Decrescenzo,* No. Civ. A. 94–3991, 1996 WL 510095 (E.D.Pa. Sept.9, 1996); *Moser v. Bascelli,* 865 F.Supp. 249, 252 (E.D.Pa.1994). Because Plaintiffs do not allege negligence within any of the enumerated categories on the part of Salisbury Township, Salisbury Township Police Department, or their employees, but rather allege only intentional torts,[35] none of

---

**32.** We noted previously that Plaintiffs also alleged in their Complaint that all Defendants violated Plaintiffs' Fourth and Fourteenth Amendment rights by illegally searching Plaintiffs' persons and/or property, and by illegally seizing Plaintiffs' Property. Plaintiffs failed to point to record evidence or present arguments as to these claims in their Memorandum, and we therefore deem these claims to be waived. Accordingly, we will enter partial summary judgment in favor of the Township as to the Plaintiffs' § 1983 claims under the Fourth and Fourteenth Amendments for the unreasonable search of Plaintiffs' persons and/or property and the unreasonable seizure of Plaintiffs' property.

**33.** We note once again that although the Plaintiffs did not explicitly assert in their Complaint that they were bringing claims under both state and federal law, Defendants did acknowledge the possibility that claims were being brought under state law. Defendants

declined to address the state law claims on the merits, however, arguing only that this Court lacks jurisdiction. We have already established our jurisdiction, *see* Part I., *supra,* and will now address the state law claims on the merits, because Defendants moved for summary judgment as to all counts of the Complaint.

**34.** The exceptions concern the following areas: vehicle liability; care, custody or control of personal property; real property; trees, traffic controls and street lighting; utility service facilities; streets; sidewalks; and the care, custody, or control of animals. 42 Pa. Cons.Stat. § 8542(b).

**35.** The Plaintiffs allege false arrest, illegal search and seizure, excessive force/physical brutality, interference with family relationships, false imprisonment, defamation, malicious or retaliatory prosecution, and abuse of process.

the exceptions to governmental immunity apply. Therefore all of Plaintiffs' state law claims against Salisbury Township and Salisbury Township Police Department are barred, and we will grant Salisbury Township and Salisbury Township Police Department partial summary judgment as to all state law claims.

### B. Officer Anderson and Officer Soberick

#### 1. Immunity Issues

■ The Pennsylvania Tort Claims Act provides that an employee of a local agency is liable for acts within the scope of his office or duties only to the same extent as his employer, 42 Pa. Cons.Stat. Ann. § 8545, and is entitled to the defense of official immunity for conduct that "was authorized or required by law, or that [the employee] in good faith reasonably believed ... was authorized or required by law, id. § 8546, but eliminates both the restriction on liability and the immunity defense if there has been a judicial determination that, inter alia, the employee's act constituted willful misconduct, id. § 8550. Willful misconduct, for the purposes of tort law, has been defined by the Pennsylvania Supreme Court to mean conduct whereby the actor desired to bring about the result that followed or was aware that it was substantially certain to follow, so that such desire can be implied." Evans v. Philadelphia Transportation Company, 418 Pa. 567, 212 A.2d 440 (1965). In other words, the term "willful misconduct" is synonymous with the term "intentional tort." King v. Breach, 115 Pa.Cmwlth. 355, 540 A.2d 976, 981 (1988); see also W. Prosser, Handbook of the Law of Torts, 31 (4th ed.1971).

King was decided by the Commonwealth Court and the Pennsylvania Supreme Court did not follow King in Renk v. City of Pittsburgh, 537 Pa. 68, 641 A.2d 289 (1994), stating that King has no precedential value in cases involving allegations of police misconduct. Id. 641 A.2d at 293. The court concluded that despite a jury

verdict in a civil action against a police officer for the intentional torts of assault, battery and false imprisonment, the actions of the officer did not necessarily rise to the level of willful misconduct. The court held that in such cases it is improper to equate intentional torts with willful misconduct as in King. Instead, there must be a determination not only that the officer committed the acts in question, but that he willfully went beyond the bounds of the law. Therefore an officer may be liable for assault and battery if it is shown not just that he acted intentionally, but also that the officer knew that force used was not reasonable under the circumstances, and the officer may be held liable for false imprisonment only if a jury concludes both that there was no probable cause to make the arrest, and that the officer knew that there was no probable cause. See id. 641 A.2d at 293–94.

Despite the Pennsylvania Supreme Court's emphasis on the conduct of police being at issue in not following King, see In Re City of Philadelphia Litig., 938 F.Supp. 1264, 1273 (E.D.Pa.1996) (noting that the Supreme Court of Pennsylvania distinguished King as not being a police case, and stating "Renk, like the case before us, is a case about police conduct in the sense that the total enterprise for which the plaintiffs seek to hold the Police Commissioner, the Fire Commissioner and the Managing Director accountable was a law enforcement enterprise to effectuate arrests"), there seems to be some disagreement whether Renk applies only to police and other law enforcement, whether it applies to them only in certain cases, or whether it applies to all actions of employees of local agencies in the scope of their duties. Numerous cases emphasize the need to show "willful misconduct aforethought," Ferber v. City of Philadelphia, 661 A.2d 470, 476 (Pa.Cmwlth.1995), or "misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose," In Re City of

*Philadelphia Litig.*, 938 F.Supp. 1264, 1273 (E.D.Pa.1996), *aff'd* 158 F.3d 723, 728 (3d Cir.1998), in typical cases challenging police conduct, such as those challenging the validity of arrests or the force used during those arrests. At least two courts have recognized that *Renk* carefully distinguished between police and non-police actors and therefore applied *King* instead of *Renk. Owens v. City of Philadelphia*, 6 F.Supp.2d 373, 394 (E.D.Pa.1998) (declining to apply *Renk* in a wrongful death case arising from the suicide of an inmate, because even though the conduct challenged was that of law enforcement officers, it was not "police misconduct" in the sense used by *Renk* ); *Miller v. Webber*, Civ. A. No. 96–5832, 1997 WL 299447, at *5 (E.D.Pa. May 30, 1997) (applying *King* instead of *Renk* where conduct complained of was performed part of defendants' duties to administer a part-time employment program at a public school). A number of cases have applied *Renk* in non-police cases and have failed to note the distinction made in *Renk. See Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 600–01 (3d Cir.1998) (applying *Renk* to members of the Philadelphia Historical Commission); *Kuzel v. Krause*, 658 A.2d 856, 860 (Pa.Cmwlth. 1995) (applying *Renk* in a wrongful termination case brought against township supervisors).

We believe that *Renk* applies to the case before us, but under either the *Renk* standard or the *King* standard, there must be a judicial determination into whether there was "willful misconduct." Because this inquiry requires a finding of facts as to the state of mind of the officers, it must be performed by the jury if there is sufficient evidence in the record now to support such a finding by a reasonable jury. We will now consider the immunity issue and the substance of each state law claim in turn to determine on which claims, if any, Officers Anderson and Soberick are entitled to summary judgment.

**2. False Arrest Claims**

Pennsylvania state law false arrest claims and federal constitutional false arrest claims are co-extensive both as to elements of proof and elements of damages. *Patzig v. O'Neil*, 577 F.2d 841, 851 (3d Cir.1978). In Pennsylvania, a "false arrest is defined as 1) an arrest made without probable cause or 2) an arrest made by a person without privilege to do so." *McGriff v. Vidovich*, 699 A.2d 797, 799 (Pa.Cmwlth.1997) (citing Pennsylvania Suggested Standard Civil Jury Instructions § 13.04). Plaintiffs allege that they were arrested without probable cause. The Pennsylvania and federal standards for the existence of probable cause are the same. *See Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (1994). As noted in Part IV. B. 1, *supra*, probable cause is a jury issue. Plaintiffs have also alleged sufficient facts from which a jury could determine that the Officers did not believe they had probable cause when they arrested the Russolis, thus removing their official immunity and restriction on liability.[36] Officer Anderson even admitted that he was unaware of any law giving him the authority to order the Russolis to leave their property. (T. Anderson Test. at 59.) Therefore we will deny the Officers motion for summary judgment as to Plaintiffs' state law false arrest claims.

**3. False Imprisonment Claims**

In Pennsylvania, "the elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention." *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (1994). An arrest is lawful if it is based upon

---

**36.** We note that the qualified immunity standard applied to § 1983 claims is an objective test, while Pennsylvania's official immunity standard is a subjective test. Therefore an officer may have qualified immunity under § 1983 but not be entitled to official immunity under Pennsylvania law if his actions were objectively reasonable but he knowingly acted unlawfully.

probable cause. *See id.; see also Fagan v. Pittsburgh Terminal Coal Corporation*, 299 Pa. 109, 149 A. 159 (1930). As noted in Part IV. B. 1, *supra*, probable cause is a jury issue. As noted previously, Plaintiffs have also alleged sufficient facts from which a jury could determine that the Officers did not believe they had probable cause when they arrested the Russolis, thus removing their official immunity and restriction on liability. Therefore we will deny the Officers' motion for summary judgment as to Plaintiffs' state law false imprisonment claims.

### 4. Excessive Force Claims

 A claim brought under Pennsylvania law for excessive force by a police officer is a claim for assault and battery. *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289 (1994). In making an arrest, a police officer "is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest." 18 Pa. Cons.Stat. Ann. § 508; *see also Renk* at 293. In addition to this subjective standard, *Renk* notes that

> A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty. In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest. The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery.

*Id.* As noted in Part IV. C. 1., *supra*, there are disputed facts which preclude us from determining whether the Officers' use of force was reasonable. Plaintiffs have also alleged sufficient facts from which a jury could determine that the Officers knew that the force they used was unreasonable under the circumstances, which would remove their official immunity and restriction on liability. Therefore we will deny the Officers' motion for summary judgment on Plaintiffs' state law excessive force claims.

### 5. Illegal Search and Seizure Claims

To the extent that these claims were intended to be with regard to the illegal seizure of the Plaintiffs' persons, we have already discussed them in Part V.B. 2., *supra*. To the extent that these claims are intended to be with regard to the illegal seizure of Plaintiffs' property or the illegal search of the Plaintiffs' persons or property, we deem them to be waived because Plaintiffs have presented no argument on these claims in their Memorandum. Therefore we will grant partial summary judgment to the Officers with respect to Plaintiffs' state law claims for seizure of Plaintiffs' property and search of Plaintiffs' persons or property.

### 6. Malicious Prosecution Claims

 In Pennsylvania, a plaintiff alleging common law malicious prosecution must show: (1) the defendants initiated a criminal proceeding; (2) without probable cause; (3) with malice; (4) which was subsequently terminated in plaintiff's favor. *Merkle v. Upper Dublin School District*, 211 F.3d 782, 791 (3d Cir.2000); *Hilfirty v. Shipman*, 91 F.3d 573, 579 (3d Cir.1996).

 Malicious prosecution is an intentional tort that falls within 42 Pa. Cons. Stat. § 8550. *See King*, 540 A.2d at 980. *See also Barnes v. City of Coatesville*, No. Civ. A. 93–1444, 1993 WL 259329 (E.D.Pa. June 28, 1993); *DiBartolo v. City of Philadelphia*, No. Civ. A. 99–CV–1734, 2000 WL 217746, at *8. (E.D.Pa. Feb.15, 2000). Therefore the Officers do not have immunity for Plaintiffs' malicious prosecution claims.

Because Officer Anderson and Officer Soberick are not entitled to immunity under the Pennsylvania Tort Claims Act, we will now examine whether Plaintiffs have sufficiently alleged the tort of malicious prosecution. As to whether Officers Anderson and Soberick initiated a pro-

ceeding against the Plaintiffs that terminated in their favor, there is no dispute. The criminal charges were dismissed at the close of the prosecution's case, so the proceeding did terminate in favor of the Plaintiffs. Officers Anderson and Soberick filed the citations charging the Russolis with disorderly conduct. (*See* T. Anderson Interrog.) In connection with a malicious prosecution claim, to "initiate" a proceeding, a defendant does not have to bring the proceedings himself or explicitly direct that the prosecution be started. *Bristow v. Clevenger,* 80 F.Supp.2d 421, 432 (M.D.Pa.2000); *Gilbert v. Feld,* 788 F.Supp. 854, 861 (E.D.Pa.1992). Liability for malicious prosecution can attach when a defendant influences a third party to initiate the proceedings. *Gilbert,* 788 F.Supp. at 861. The filing of citations is sufficient to constitute "initiation" of the proceedings. *See Shoop v. Dauphin County,* 766 F.Supp. 1327, 1337 (M.D.Pa. 1991). The remaining two elements, whether there was probable cause and whether the Officers acted with malice, are in dispute.

Both Officers contend that they had probable cause to initiate the criminal proceedings against the Plaintiffs. In a malicious prosecution case, the question of probable cause is for the court and not the jury. *Bristow,* 80 F.Supp.2d at 433–434; *Simpson v. Montgomery Ward & Co.,* 354 Pa. 87, 46 A.2d 674, 675–676 (1946) ("There is no principle more firmly imbedded in the law than the principle that in case of malicious prosecution, the question of want of probable cause for the criminal prosecution which gave rise to the civil action is a question not for the jury but for the court."). However, when the probable cause determination depends upon disputed issues of fact, the court should submit the factual disputes to the jury, and then make the probable cause determination based upon the jury's findings. *Simpson,* 46 A.2d at 678–679; *Thomas v. E.J.Korvette, Inc.,* 476 F.2d 471, 475 (3d Cir.1973).

The Officers assert that they believed that the Plaintiffs committed Disorderly Conduct and that ADA Greenwald agreed with them. We believe, however, that there are significant issues of material fact, including questions of credibility, that prevent use from finding that the Officers believed that Plaintiffs were guilty of Disorderly Conduct. Accordingly, this Court cannot determine as a matter of law that Defendants had probable cause to initiate criminal proceedings against Plaintiffs.

 Turning to the final element, malicious intent, Plaintiffs have put forth enough evidence to survive a motion for summary judgment as to the question of whether the Officers acted maliciously. Malice includes both ill will in the sense of spite and the use of a prosecution for an extraneous, improper purpose. *Bristow,* 80 F.Supp.2d at 435 (citing *Hugee v. Pennsylvania R. Co.,* 376 Pa. 286, 101 A.2d 740, 743 (1954)). Malice can also be inferred from the absence of probable cause. *Id. See also Kelley v. General Teamsters, Chauffeurs, and Helpers, Local Union 249,* 518 Pa. 517, 544 A.2d 940, 941 (1988). In this case, there is evidence to suggest that the Officers filed the criminal charges to retaliate for the Plaintiffs' filing a § 1983 action against them. Whether or not the Officers acted with malice turns on an issue of credibility that we cannot resolve at the summary judgment stage, and we therefore will deny the Officers' motion for summary judgment as to Plaintiffs' state law malicious prosecution claim.

### 7. Defamation Claims

Plaintiffs allege that Officer Anderson maliciously circulated defamatory statements against Mr. Russoli by telling neighbors that he was drunk. Such an allegation brings Mr. Russoli's defamation claim within the ambit of § 8550, *see Yakowicz,* 120 Pa.Cmwlth. 479, 548 A.2d 1330, 1334 n. 5 (1988) (noting that § 8550 would "permit a defamation action based on malicious publication to be brought against a local agency employee."), under either the *King*

or the *Renk* standard, *see* Part V.B. 1., *supra.*

 Under Pennsylvania law, a defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 923 (3d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). To establish a cause of action for defamation, the plaintiff has the burden of proving: 1) the defamatory character of the communication; 2) its publication by the defendant; 3) its application to the plaintiff; 4) the understanding by the recipient of its defamatory meaning; 5) the understanding by the recipient of it as intended to be applied to the plaintiff; 6) special harm resulting to the plaintiff from its publication. 42. Pa. Cons.Stat. § 8343(a)(1)-(5) (1988); *U.S. Healthcare, Inc.,* 898 F.2d at 923. In order to recover damages, the plaintiff must also demonstrate that the statement results from fault, amounting to at least negligence, on the part of the defendant. *Id.* at 923. Finally, the plaintiff has the burden of proving special harm resulting from the statement. 42 Pa. Cons.Stat. § 8343(a)(6). Special harm is the loss of something having economic or pecuniary value. *See* Restatement (Second) of Torts § 575 Comm. b.

 *Officer Anderson denies making the statement to the Smiths that Mr. Russoli was drunk.* Even if Officer Anderson made such a statement, Plaintiffs have not pointed to evidence of the defamatory character of such a statement or that the recipients understood the statement to be defamatory. Neither of the Smiths understood the statement to be defamatory. Mrs. Smith did not believe Officer Anderson when he told her that Mr. Russolli was drunk, and also told him "can't someone have a drink in their own house?" (Doris Smith Dep. at 10.) Mr. Smith also testified that he did not believe Officer Anderson, and that "no matter what anybody would have said about Charley, it wouldn't lower my opinion of him." (Dale Smith Dep. at 44-45.) The Defendants also assert that, if a defamatory statement were made, they are entitled to summary judgment because Mr. Russoli has failed to establish that he has suffered special harm, or even any damages. We agree with Defendants' assessment of the facts presented by Plaintiffs. Therefore because Plaintiffs have failed to point to record facts establishing several necessary elements of the tort of defamation, we will grant partial summary judgment to the Officers with respect to the Plaintiffs' state law defamation claim.

## 8. Interference with Family Relationships Claims

As discussed in Part IV. H., *supra,* in their Memorandum opposing Defendants' Motion for Summary Judgment, Plaintiffs have failed to specify which facts are the basis of their claim or point to evidence of any interference with their family relationship. Plaintiffs fail to even argue that we should exercise supplemental jurisdiction as to this claim and fail to make any legal argument supporting such a claim. We therefore deem such a claim to be waived and will grant partial summary judgment to the Officers as to Plaintiffs' state law interference with family relationship claim.[37]

**37.** Even if Plaintiffs had not waived the claim, Defendants would still be entitled to summary judgment. Presumably the Plaintiffs are alleging an indirect claim for loss of consortium as a result of the Officers' actions, but they have failed to make out a prima facie case for such loss. A claim of loss of consortium arises from an injury to marital expectations whereby one spouse is deprived of the society, companionship, and affection of the other in their life together. *See Darr Construction Co. v. Workmen's Compensation Appeal Board,* 552 Pa. 400, 715 A.2d 1075, 1079-1080 (1998). Plaintiffs allege generally in their Complaint that they have suffered pain, stress, and anxiety as a result of Defendants'

## VI. PUNITIVE DAMAGES

The Complaint requests punitive damages against all Defendants as to every claim. In their Motion for Summary Judgment, Defendants argue that Plaintiffs are not entitled to recover punitive damages in this matter as to any claim.

### A. Section 1983 Claims

 Punitive damages are not available against municipalities for § 1983 violations, so even if Salisbury Township were not entitled to summary judgment on all of the § 1983 claims, such damages would not be available. *City of Newport v. Fact Concerts,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Punitive damages are available against individual state actors, however, upon a showing that the conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *see also Keenan v. City of Philadelphia,* 983 F.2d 459 (3rd Cir.1992); *Basista v. Weir* 340 F.2d 74 (3d Cir.1965) (recognizing that punitive damages are available in § 1983 cases based on allegations of unlawful arrest and excessive force). "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986).

The objective standard of "callous or reckless indifference" that suffices for an award of punitive damages is not far removed from the standard for denying qualified immunity to the officers—whether a reasonable officer would have known that his conduct violated a clearly established constitutional right. Therefore any claim that will be tried and for which the jury finds facts that would result in our denying qualified immunity could also be the basis for punitive damages. Whether or not punitive damages are appropriate will depend on the jury's findings as to the circumstances of the Officers' actions and their states of mind. Therefore punitive damages may be available against the Officers, and we will therefore deny their motion for summary judgment, as to the following § 1983 claims: unlawful arrest and false imprisonment of Mr. Russoli, excessive force against Mr. and Mrs. Russoli, and retaliatory prosecution of Mr. and Mrs. Russoli.

### B. State Law Claims

 The legal standard for punitive damages for state law claims is a matter of state law. *See Griffiths v. CIGNA Corp.,* 857 F.Supp. 399, 409–410 (E.D.Pa.1994), *aff'd,* 60 F.3d 814 (3rd Cir.1995). Defendants Salisbury Township and Salisbury Township Police Department have immunity on all of the state law claims, *see* Part V. A., *supra,* but even if they did not, they would not be directly liable for punitive damages, *see Township of Bensalem v. Press,* 93 Pa.Cmwlth. 235, 501 A.2d 331, 338 (1985).

Punitive damages may be available against Officers Anderson and Soberick, however. The Supreme Court of Pennsylvania has adopted the Restatement (Second) of Torts, § 908(2), which permits punitive damages for "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58, 69 (1989) (quoting Rest. (2d) Torts § 908(2)). The proper focus is on "the act itself together with all the circumstances including motive of the wrongdoer and the relations between the parties ...." *Id.* (citing *Chambers v. Montgomery,* 411 Pa. 339, 192 A.2d 355, 358 (1963)). Further, "[a] court may award punitive damages only if the conduct was malicious, wanton, reckless, will-

---

actions, but neither in their Complaint nor their Memorandum do they explain the effect on their marital relationship, nor do they

point to evidence in the record showing the existence of any negative effects.

ful, or oppressive." *Id.* (citing *Chambers,* 192 A.2d at 358). The actor's state of mind is also relevant: "The act or omission must be intentional, reckless, or malicious." *Id.* (citing *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 748 (1984)).

We have already stated, in Part V. B., *supra,* that Officers Anderson and Soberick are entitled to official immunity for their official actions, except those which constituted, inter alia, willful misconduct. The Plaintiffs must prove substantially similar states of mind of the Officers and the circumstances surrounding their actions to overcome the hurdle of official immunity and to recover punitive damages. Therefore any claims that must go to the jury on their merits may also be considered for punitive damages. Specifically, the jury may consider whether punitive damages are appropriate for the state law false arrest, false imprisonment, excessive force, and malicious prosecution claims, if the Officers are not entitled to official immunity, and we will therefore deny their motion for summary judgment as to these claims.

## VII. SUMMARY

For the foregoing reasons, we will grant summary judgment to Salisbury Township and Salisbury Township Police Department on all claims, both state and federal. We will grant summary judgment to Officers Anderson and Soberick on both Plaintiffs' § 1983 claims of interference with access to the courts, and their state and federal claims for the following: illegal search of Plaintiffs and their property; illegal seizure of Plaintiffs' property; abuse of process; defamation; and interference with Plaintiffs' family relationship. We will also find qualified immunity and grant summary judgment to the Officers as to the § 1983 unlawful arrest and false imprisonment claims of Mrs. Russoli. We will deny summary judgment to the Officers as to the as to the § 1983 unlawful arrest and false imprisonment claims of Mr. Russoli; the state law unlawful arrest

and false imprisonment claims of both Plaintiffs; the state and federal excessive force/physical brutality claims of both Plaintiffs; and the state and federal malicious or retaliatory prosecution claims of both Plaintiffs.

We will also enter final judgment pursuant to Fed.R.Civ.P. 54(b) as to those claims for which we will grant summary judgment. In a suit such as the instant one that involves multiple parties or in which more than one claim for relief is presented, we "may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties," but we may only do so "upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). Final judgment under this rule is not to be entered routinely, *Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 10, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980); instead, we must exercise our discretion "in the interest of sound judicial administration." *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 437, 76 S.Ct. 895, 100 L.Ed. 1297 (1956).

In order to enter partial final judgment, we must first determine that we are "dealing with a final judgment." *Curtiss–Wright Corp.,* 446 U.S. at 7, 100 S.Ct. 1460 (citing *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 76 S.Ct. 895, 100 L.Ed. 1297 (1956)). "It must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is an 'ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Id.* Here, we are entering judgment in favor of two of the Defendants, Salisbury Township and Salisbury Township Police Department, as to all claims. We are also entering judgment for Defendants Thomas E. Anderson and Kevin J. Soberick as to a number of claims under the United States Constitution and Pennsylvania law, but not as to all claims in the action. Plaintiffs will be barred under the doctrine of res

judicata from raising these claims again in any court, unless our judgment is vacated by the Court of Appeals for the Third Circuit; thus the judgment will be final.

Next we must determine whether there is any just reason for delaying entry of final judgment. We must balance the interests of "sound judicial administration" and the equities involved, i.e. justice to the litigants. *Curtiss–Wright*, 446 U.S. at 2, 100 S.Ct. 1460; *see also Carter v. City of Philadelphia*, 181 F.3d 339, 346 (3rd Cir. 1999); *Waldorf v. Shuta*, 142 F.3d 601, 608 (3d Cir.1998). As the Third Circuit has stated, "[t]he rule attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties." *Allis–Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 363 (3d Cir.1975).

In determining whether there are "just reasons for delay," we should consider " 'whether the claims under review [are] separable from the others remaining to be adjudicated and whether the nature of the claims already determined [is] such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals.' " [38] *Carter*, 181 F.3d at 346 (quoting *Curtiss–Wright*, 446 U.S. at 7, 100 S.Ct. 1460). The *Carter* court noted further that "some factual overlap between the issues in [the] appeal and those in a potential future appeal" is permissible, because "[i]t is generally recognized that complete legal or factual distinction is not necessary to 54(b) certification." *Id.* at 346 & n. 20 (citing 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2657 at 50–54).

The parties and claims as to which we will enter final judgment are separable from those that will proceed to trial. Our entry of final judgment in favor of Salisbury Township and Salisbury Township Police Department on all claims will have the effect of completely removing these parties from the action. The bases for granting summary judgment to the Police Department on the § 1983 claims, i.e. not being a separate judicial entity, and granting immunity from suit to both Salisbury Township and Salisbury Township Police Department on the state law claims, i.e. governmental immunity, cannot be applied to the individual Defendants, Thomas E. Anderson and Kevin J. Soberick. The claims against Salisbury Township under § 1983 are based on different or additional facts and theories of law than the claims against the individual defendants, i.e. a policy, practice, or custom of deliberate indifference to constitutional rights. For the foregoing reasons, different issues would be raised on an appeal of our entering judgment in favor of Salisbury Township and Salisbury Township Police Department than would be raised in an appeal of claims against Thomas E. Anderson and Kevin J. Soberick.

The § 1983 and state law claims against Thomas E. Anderson and Kevin J. Soberick as to which we will enter judgment arose during the same course of events and their aftermath as those that will proceed to trial, but they are nonetheless separable and will raise substantially different factual and legal issues on appeal. The § 1983 unlawful arrest and false im-

---

**38.** The Supreme Court in *Curtiss–Wright* clarified as follows:

We do not suggest that the presence of one of these factors would necessarily mean that Rule 54(b) certification would be improper. It would, however, require the district court to find a sufficiently important reason for nonetheless granting certification. For example, if the district court concluded that there was a possibility that an appellate court would have to face the same issues on a subsequent appeal, this might perhaps be offset by a finding that an appellate resolution of the certified claims would facilitate a settlement of the remainder of the claims.

446 U.S. at 7, 100 S.Ct. 1460 (citing *Cold Metal Process Co. v. United Engineering & Foundry Co.*, 351 U.S. 445, 450, n. 5, 76 S.Ct. 904, 100 L.Ed. 1311 (1956)).

prisonment claims of Mr. Russoli, which are going to trial, and those of Mrs. Russoli, on which we will enter final judgment, are separable because the arrests of Mr. and Mrs. Russoli were based on distinctly different sections of Pennsylvania's disorderly conduct statute. *See* Parts IV. B. 2. b. and c., *supra.* Further, the § 1983 and state law unlawful arrest and false imprisonment claims of Mrs. Russoli are separable because of the different standards for immunity for § 1983 and Pennsylvania claims. *See* Parts IV. B. 2. b. and V.B. 1., 2., and 3., *supra.* Although Plaintiffs' state and federal claims for the illegal search of Plaintiffs and their property allegedly arose during the arrests of the Plaintiffs, whether a search occurred is unrelated to the propriety of the arrests or the force used during the arrests. There is factual overlap between the allegedly illegal seizure of Plaintiffs' property and the propriety of the force used to effect the arrests of the Plaintiffs, but Plaintiffs completely failed in their Memorandum opposing Defendant's Motion for Summary Judgment to address any claims regarding the illegal seizure of Plaintiffs' property, so we deemed such claims to be waived. *See* Part IV. C. and n.15, *supra.* There may be some factual overlap between the state and federal malicious or retaliatory prosecution claims, which are proceeding to trial, and both the § 1983 claims of interference with access to the courts and the § 1983 and state claims for abuse of process, as to which we will enter final judgment in favor of the Officers, but these claims contain a number of different elements. *See* Parts IV. E. and F., and V.B. 6., *supra.* Finally, the § 1983 and state claims for defamation and interference with Plaintiffs' family relationship bear little factual or legal similarity to the claims that are proceeding to trial. Because there is little likelihood that the Court of Appeals for the Third Circuit would be presented with the same issues on appeal from the claims as to which we will grant summary judgment and the claims that are proceeding to trial, and because such

claims are separable, we find no just reason for delay in entering final judgment as to the claims as to which we will grant summary judgment.

An appropriate order follows.

### ORDER

AND NOW, this 20th day of October, 2000, upon consideration of Plaintiffs' First Amended Complaint, filed on December 8, 1998; Defendants' Motion for Summary Judgment, Defendant's Memorandum of Law in Support of Defendants' Motion for Summary Judgment, and attachments thereto, filed on July 26, 2000; Plaintiffs' Memorandum of Law in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment and attachments thereto, filed on August 14, 2000; Plaintiffs' Counsel's letter addressed to this Court, dated September 12, 2000, and its attachments, to wit the materials relied upon by Plaintiffs' expert, Walter P. Connery, in creating his report; and Defendants Salisbury Township, Salisbury Township Police Department, Officer Thomas E. Anderson and Officer Kevin J. Soberick's Reply Memorandum to Plaintiffs' Response to Defendant's Motion for Summary Judgment Pursuant to F.R.C.P. 56, filed September 14, 2000; it is hereby ORDERED, consistent with the foregoing Opinion, that:

1. Partial summary judgment is GRANTED and JUDGMENT IS ENTERED as follows:

 (a) Partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Salisbury Township with respect to all claims.

 (b) Partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Salisbury Township Police Department with respect to all claims.

 (c) Qualified immunity is FOUND and partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Thomas E.

Anderson and Kevin J. Soberick with respect to Marguerite Russoli's 42 U.S.C. § 1983 claims under the Fourth and Fourteenth Amendments to the United States Constitution for unlawful arrest and false imprisonment.

(d) Partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Thomas E. Anderson and Kevin J. Soberick with respect to Charles and Marguerite Russoli's 42 U.S.C. § 1983 claims under the Fourth and Fourteenth Amendments to the United States Constitution and their state law claims for the illegal search of the Plaintiffs or their property.

(e) Partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Thomas E. Anderson and Kevin J. Soberick with respect to Charles and Marguerite Russoli's 42 U.S.C. § 1983 claims under the Fourth and Fourteenth Amendments to the United States Constitution and their state law claims for the illegal seizure of Plaintiffs' property.

(f) Partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Thomas E. Anderson and Kevin J. Soberick with respect to Charles and Marguerite Russoli's 42 U.S.C. § 1983 claims under the First and Fourteenth Amendments to the United States Constitution for violation of Plaintiffs' right of access to the courts.

(g) Partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Thomas E. Anderson and Kevin J. Soberick with respect to Charles and Marguerite Russoli's 42 U.S.C. § 1983 claims under the First and Fourteenth Amendments to the United States Constitution and their state law claims for abuse of process.

(h) Partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Thomas E. Anderson and Kevin J. Soberick with respect to Charles and Marguerite Russoli's 42 U.S.C. § 1983 claims under the Fourteenth Amendment to the United States Constitution and their state law claims for defamation.

(i) Partial summary judgment is GRANTED and JUDGMENT IS ENTERED in favor of Thomas E. Anderson and Kevin J. Soberick with respect to Charles and Marguerite Russoli's 42 U.S.C. § 1983 claims under the Fourteenth Amendment to the United States Constitution and their state law claims for interference with Plaintiffs' family relationship.

2. Summary judgment is DENIED in all other respects, and the following claims shall proceed to trial:

(a) Charles Russoli's claims against Thomas E. Anderson and Kevin J. Soberick under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution for unlawful arrest and false imprisonment.

(b) Charles and Marguerite Russoli's claims against Thomas E. Anderson and Kevin J. Soberick under state law for unlawful arrest and false imprisonment.

(c) Charles and Marguerite Russoli's claims against Thomas E. Anderson and Kevin J. Soberick under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution and under state law for excessive force or physical brutality.

(d) Charles and Marguerite Russoli's claims against Thomas E. Anderson and Kevin J. Soberick under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution and un-

der state law for malicious or retaliatory prosecution.